**SLATKY, John, Appellant,**

v.

**AMOCO OIL COMPANY, Appellee, Service Station Dealers of America, Inc., Amicus Curiae.**

No. 86–5102.

United States Court of Appeals, Third Circuit.

Argued Aug. 20, 1986.

Reargued In Banc May 4, 1987.

Decided Sept. 30, 1987.

Joel Weisberg (argued), Harrisburg, Pa., for appellant.

Dimitri G. Daskal, Washington, D.C., for amicus curiae.

John A. Guernsey (argued), DeStefano & Guernsey, Philadelphia, Pa., Marguerite E. McDermed, Amoco Corp., Chicago, Ill., for appellee.

Argued Aug. 20, 1986.

Before BECKER, MANSMANN, Circuit Judges, and TEITELBAUM, District Judge.*

Reargued In Banc May 4, 1987.

Before GIBBONS, SEITZ, WEIS, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Under Title I of the Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. §§ 2801–06, an oil company that terminates or fails to renew a franchise for a permissible business purpose unrelated to the franchisee's misconduct must make a "bona fide offer" to sell to the franchisee the leased property used by the franchisee in his business. §§ 2802(b)(2)(E)(iii)(I); 2802-(b)(3)(D)(iii)(I). This appeal from the judgment of the district court, 626 F.Supp. 1223, following a bench trial, in favor of appellee Amoco Oil Company and against one of its franchisees, appellant John Slatky, requires us to decide what this "bona fide offer" provision requires the oil company (hereinafter "distributor") to do and in what manner courts should scrutinize the distributor's offer in determining its *bona fides.*

The district court found that Amoco sincerely believed its offer price, derived from its internal business practices, was at fair market value and that the offer had a reasonable basis in fact because its procedures were reasonable, notwithstanding that the price was substantially higher than the estimate of independent appraisers retained by Slatky and by Amoco itself. We conclude that the district court erred in failing to insist that the offer be objectively reasonable, i.e., that it approach fair market value. We therefore reverse and remand for further proceedings.

## I. *The Statutory Scheme*

Title I of the PMPA generally regulates the relationship between distributors of motor fuel, principally oil refiners, and their franchisees, principally retail gas station operators, many of whom lease their stations from the distributors. Evidence at Congressional hearings indicated that distributors had been using the threat of termination or nonrenewal to compel franchisees to comply with the distributor's marketing policies. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, *reprinted in* [1978] *U.S.Code Cong. & Ad.News* 873, 875–77 (hereinafter "Senate Report"). In addition, Congress found that franchisors had used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes. *Id.*

In passing the PMPA, Congress determined that franchisees had a "reasonable expectation[ ]" that "the [franchise] relationship will be a continuing one." Senate Report at 18, U.S.Code Cong. & Ad.News 1978, at 876. The PMPA's goal is to protect a franchisee's "reasonable expectation" of continuing the franchise relationship while at the same time insuring that distributors have "adequate flexibility ... to respond to changing market conditions and consumer preferences." Senate Report at 19, U.S.Code Cong. & Ad.News 1978, at 877. To accomplish these purposes, the PMPA works principally by limiting the grounds on which distributors may terminate or fail to renew a franchise. 15 U.S.C. § 2802. The PMPA also provides various notification requirements, some of which guarantee a franchisee an opportunity to correct any improper conduct with which he has been charged. *See* §§ 2802, 2804.

Most of the grounds for termination or nonrenewal involve some form of franchisee misconduct. For example, a distributor may terminate for a franchisee's failure to pay sums due under the franchise agreement, *see* § 2802(b)(2)(C) (incorporating § 2802(c)(8)), or for a franchisee's "fraud or criminal misconduct ... relevant to the operation" of the property, § 2802(b)(2)(C) (incorporating § 2802(c)(1)). A distributor may fail to renew because of

---

* Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

numerous "bona fide customer complaints" about the franchisee's operations of the property, *see* § 2802(b)(3)(B), or because of a franchisee's failure to operate a property "in a clean, safe, and healthful manner," *see* § 2802(b)(3)(C).

To assure distributors' market flexibility, however, the Act also permits termination or nonrenewal because of certain distributor business decisions. So long as a franchisee has received or been offered at least a three year franchise agreement, a distributor may terminate or fail to renew a franchise agreement if it decides "in good faith and in the normal course of business" to withdraw from the relevant geographic market area. *See* § 2802(b)(2)(E).[1]

In addition, for three-year franchisees, a distributor may fail to renew the agreement of a franchisee who leases a property from the distributor if the distributor determines "in good faith and in the normal course of business:

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

(II) to materially alter, add to, or replace such premises,

(III) to sell such premises, or

(IV) that renewal of the franchise relationship is likely to be uneconomical to the franchisor [distributor] despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee."

§ 2802(b)(3)(D)(i).

Whenever a distributor terminates or fails to renew a franchise relationship for one of these business purposes, however, he must meet several other requirements. First, the distributor may not terminate or fail to renew in order to convert the property to direct management by its own employees or agents. *See* § 2802(b)(2)(E)(ii), 2802(b)(3)(D)(ii). Second, the distributor must either make a "bona fide offer" to sell the property or, if applicable, provide the franchisee a right of first refusal on an offer made by another. *See* §§ 2802(b)(2)(E)(iii)(I); 2802(b)(3)(D)(i).[2] The meaning of the "bona fide offer" requirement under the nonrenewal subsection, § 2802(b)(3)(D)(i), is the principal issue in this case.

## II. *Facts and Procedural History*

For several years, Slatky was an Amoco franchisee, leasing a gasoline station in York, Pennsylvania. In May, 1985, following a year in which Slatky's sales volume started to decline, Amoco determined not to renew Slatky's franchise on the ground that renewal would be uneconomical despite any reasonable changes or additions to the franchise relationship to which Slatky might agree. Amoco gave proper notice, and because it based its nonrenewal on § 2802(b)(3)(D)(i)(IV), it proceeded, in a letter dated June 28, 1985, to offer to sell Slatky the station for $306,300.00 without the underground tanks and pumps. The testimony reveals that Amoco arrived at this price through a two-step process.

First, Amoco's employee Melvin O'Dell evaluated the land alone in early May, 1985. O'Dell based his appraisal on three allegedly comparable properties, which had been sold several years before. He testified, however, that he made no effort to verify his information about these "comparables" or to find other reports on other properties. O'Dell further testified that his best comparable was a property that he later found had been understated in land area by 40% and that was not suitable as a basis of comparison because of its loca-

---

1. The Senate Report explained that the disparity in bargaining power increased "as shorter franchise periods and more frequent renewal intervals are utilized." Senate Report at 18, U.S. Code Cong. & Admin.News 1978, at 877. By permitting terminations or nonrenewals for business reasons only of franchisees who had obtained or were offered three year franchises, Congress provided an incentive to distributors to provide franchises of at least that length.

2. In the case of a termination, a franchisor has a third option: he may sell the property to another franchisor and have that franchisor offer the franchisee a franchise agreement comparable to those the other franchisor has with other franchisees. *See* § 2802(b)(2)(E)(iii)(II).

tion.[3]  Based on this analysis, O'Dell appraised the value of the land at $155,000.

Following the land appraisal, another Amoco employee, Charles Bogdanowicz, performed an initial appraisal of the property improvements.  Bogdanowicz had no formal appraisal experience but had built stations for Amoco in several parts of Pennsylvania.  He estimated the replacement cost of the improvements, including tanks and lines, to be $121,300.

Based on these two estimates, Amoco's real estate manager, Eugene O'Brien, recommended a price of $276,300 to the district manager, Lemuel Warfield.  Although he did not disagree with any of the conclusions used to come up with the appraisal, Warfield sent a note back to O'Brien stating, "costs as they are today and the improvements that we have on the property, I would believe the appraisal would be more reasonable at $350,000, less tanks and lines."  Warfield asked O'Brien to review the figure, and O'Brien passed this request to O'Dell.[4]

O'Dell then reviewed his appraisal and came up with a land value of $185,000, $30,000 higher than the first estimate.  In a letter to Warfield, O'Brien stated that this new figure was "about as far as we think it should go."  Warfield then offered to sell the station to Slatky for $306,300 ($185,000 for the land plus $121,300 for the improvements), explicitly stating that this figure did not cover the tanks and pumps.  After Slatky filed his complaint in this case, Warfield sent Slatky a letter explaining that the exclusion of the tanks and pumps was mistaken and offering the property for $256,300 plus $50,000 for the tanks and pumps.

Slatky's suit seeks damages and an injunction ordering Amoco to sell the property to him at fair market value.  He did not challenge the grounds for nonrenewal but claimed that Amoco's offer of $306,300 was not a bona fide offer because it was not at fair market value.  Two certified appraisers hired by Slatky valued the property respectively at $158,200 (including pumps and tanks) and $145,000 (not including pumps and tanks).  An independent appraisal eventually commissioned by Amoco for this litigation appraised the property at $221,000 also not including pumps and tanks.

After a bench trial, the district court held that Amoco had fulfilled its obligation to make a bona fide offer.  The court accepted as a general standard the requirement that the offer be "sincere and have a reasonable basis in fact."[5]  The court found the sincerity standard met because Amoco had followed its "general" procedure for determining the selling price of property and because it believed its offer price to be at fair market value.  The court also found that Amoco's offer had a reasonable basis in fact because, although its appraiser had not followed formal appraisal techniques, "the procedures used by them were reasonable" and hence the "offer was not arbitrarily made."  The district court made no finding whether the offer actually approached fair market value, as Slatky claimed the statute required, or whether the offer was a reasonable estimate of fair market value.  This appeal followed.

### III.  *Amoco's Subjective Good Faith Standard*

#### A.

Amoco's principal contention is that we should interpret the term "bona fide" to require that a distributor make its offer only in subjective good faith.  Amoco grounds this argument on an analogy between the distributor's determination of an

---

**3.**  Testimony of Slatky's appraisers indicated that the claimed sales price for the next most comparable property could not be verified.

**4.**  Warfield had earlier told Slatky that he considered the property worth $500,000.

**5.**  The district court took this standard from *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d

Cir.1985), in which we dealt with the provision in the PMPA permitting nonrenewal of a franchise because of "bona fide customer complaints."  15 U.S.C. § 2802(b)(3)(B).  We interpreted the term bona fide there to mean "sincere and having a reasonable basis in fact."  778 F.2d at 1008.

offer price and its original determination not to renew a franchise because of a business reason permitted under § 2802(b)(3)(D). The statute requires only that the latter decision be made "in good faith and in the normal course of business." *Id.* The Senate Report states:

> These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the court to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale of distribution of motor fuel, is a wise business decision.

Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896. Contending that the decision about an offer price is essentially the same kind of business judgment as a decision not to renew the franchise, Amoco claims that the same good faith standard designed to prevent second-guessing of a distributor's business judgment should apply.

■ We reject Amoco's suggestion for several reasons. First and fundamentally, we disagree with Amoco's basic analogy between a nonrenewal decision on the one hand and the determination of a bona fide offer price on the other. We have noted that Congress wished distributors to have the flexibility to respond to changing market conditions: when making a nonrenewal decision under § 2802(b)(3)(D), distributors make such a marketing decision. So long as nonrenewal was truly based on such a marketing decision, Congress precluded courts from examining its merits. Congress did not, however, preclude courts from scrutinizing the merits of termination or nonrenewal decisions that result from a franchisee's misconduct. Whether a franchisee has truly created health or safety violations or violated a term of the franchise agreement is a question the courts may examine freely. Congress thereby distinguished between decisions involving general business matters and decisions turning on a right created by the PMPA.

■ Like a termination or nonrenewal decision for franchisee misconduct, the determination of an offer price is not a business decision. It is not a decision that the distributor decides on its own to make. Rather, the distributor sets a bona fide price only because the statute requires it to do so. Indeed, when a distributor fails to renew a franchise because of a decision to convert a property to a different use, or to alter the premises, *see* § 2802(b)(3)(D)(i)(I), (II), selling the property will interfere with its business plans. The determination of an offer price therefore represents something we may call a "compliance judgment," a judgment about how best to protect the company's interests while complying with the statute. Congress did not instruct the courts to defer to such decisions.

The legislative history reveals this distinction. Under H.R. 1300 (94th Cong), the predecessor to Title I of the PMPA, a franchisee could not obtain injunctive relief if the franchisor failed to renew on the basis of "a determination made by the franchisor in good faith and in the normal course of business" even if such nonrenewal was prohibited under the bill. H.R. 1300 § 105(e)(1)(A). But such nonrenewal decisions were remediable with money damages, which would have compensated the franchisee for the loss of its reasonable expectation of renewal. *Id.* § 105(e)(2).

Under H.R. 1300, the distributor could mitigate damages by making a bona fide offer. Responding to the pleas of the major oil companies, *see, e.g., Hearings on H.R. 130, Senate Subcomm. on Energy Conservation and Regulation of the Energy and Natural Resources Committee,* Publ. No. 95–61, 250 (95th Cong., 1st Sess.) (statement of Duval Pickey, Vice President of Marketing for Exxon), the next Congress made a bona fide offer a surrogate for damages, H.R. 130 (95th Cong.), and that provision became law. Under either bill, however, Congress treated the bona fide offer requirement not as a statutory recognition of a business judgment but as a form of compensation to the franchisee for the harm resulting from the

distributor's valid business judgment. We would misread that legislative history and permit distributors to "eat their cake and have it too" if we were to defer not only to the business merits of the distributor's business judgment but also to the distributor's sense of the fairness of its offer of compensation.

■ Second, even assuming the correctness of the analogy between nonrenewal decisions and offer price decisions, Amoco confuses procedural restrictions with substantive ones. The substantive restriction on the nonrenewal decision comes from the limitation on the distributor's grounds for renewal. The "good faith and normal course of business" requirement is essentially a procedural direction to the courts about how to judge whether the distributor has abided by the substantive restrictions and failed to renew only because of one of the statutorily permissible reasons. Thus, what the court decides in a challenge to a nonrenewal decision is not whether the distributor determined not to renew according to some elusive notion of good faith but whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the statute. *See* Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896 ("good faith test is meant to preclude sham determinations").

Amoco's suggestion that the statute only requires a distributor to determine an *offer* price in "good faith" takes this procedural standard of judicial scrutiny and turns it into a substantive restriction on the distributor's behavior. But a mere requirement to make an offer "in good faith" is essentially without content. Failing to suggest what a distributor must sincerely decide, it suggests only some kind of floating goodwill. Because it is so ephemeral, a franchisee would virtually never be able to show its absence. Even if we were to accept Amoco's analogy between the offer price decision and a decision not to renew a franchise, we would therefore adopt the "good faith" standard only as a standard of judicial scrutiny. In order to decide whether the distributor had made the offer price

in good faith, we would still have to decide what kind of offer price the statute requires.

## B.

■ Apart from its analogy between the bona fide offer provision and the decision not to renew a franchise, Amoco claims that a subjective good faith standard is consistent with the general purposes of the statute. According to Amoco, the statute seeks only to prevent "arbitrary and discriminatory" terminations and nonrenewals while otherwise leaving the distributor unfettered discretion to pursue its own economic self-interest. By requiring only that a distributor make an offer in good faith, Amoco claims, courts can prevent discriminatory conduct while otherwise allowing distributors to act in accordance with their self-interest.

This reading of the statute's requirements, however, trivializes Congress's goals. Distributors have no reason to mistreat franchisees out of simple spite, and Congress did not attribute any such motivation to them. The Senate Report makes clear that the "arbitrary and discriminatory" terminations and nonrenewals Congress wished to stop were those aimed at forcing the franchisee to accept marketing practices not set out in the franchise agreement. *Senate Report* at 12–19, 36–37, U.S. Code Cong. & Ad.News 1978, at 873–877, 894–896. Obviously, Congress found that distributors had been using their power over franchisees to further their own self-interest. In remedying this "disparity in bargaining power" by limiting the grounds for termination and nonrenewal, Congress protected the franchisee's interests by curbing those of the distributor. *Senate Report* at 18, U.S.Code Cong. & Ad.News 1978, at 876.

Other provisions also quite explicitly restrict a distributor's self-interest in favor of franchisees. In particular, Congress proscribed a distributor from terminating or failing to renew a franchise for the purpose of transferring a property to direct management by its own employees. *See* § 2802(b)(2)(E)(ii), § 2802(b)(3)(D)(ii).

These provisions in part address Congress' fear that major distributors were engaging in predatory pricing to drive independents out of business. *See* Cong.Rec. S12761–62 (daily ed. May 5, 1978) (statement of Sen. Durkin). But these provisions also reflect Congress' concern that the major distributors' desire to operate their own stations resulted in their pressing franchisees to sell out or face stiff increases in rent. *See* 123 Cong.Rec. H10,385 (daily ed. April 5, 1977) (statement of Rep. Conte). By protecting in this way the franchisee's interest in continuing to earn a livelihood from the franchise property, Congress limited the ability of the distributor to shift to more profitable direct management.

As these specific provisions illustrate, the very act of passing the PMPA indicated Congress's rejection of the view advanced by the major gasoline retailers that remedial legislation was unnecessary because the interests of distributors and franchisees were in harmony. *See, e.g., Senate Hearings, supra,* at 319–22 (statement of Kenneth E. Curtis, Vice-President of Marketing for Amoco). While a subjective good faith standard would probably enable distributors to pursue their own, unfettered self-interest, the statute does not generally guarantee distributors that right. We therefore reject this goal as a guiding principle for interpreting the bona fide offer provision.

### IV. *The Role of Fair Market Value*

#### A.

Having rejected Amoco's proffered definition of a bona fide offer, we must now derive the correct one. The starting point of all statutory analysis is the words of the statute themselves. Our review of the many statutes in which Congress has used the term "bona fide" reveals that while Congress uses the phrase in contexts in which good faith intent helps reveal and may even help determine genuineness, the term is also used to convey an objective notion of actuality.[6] For example, immigration statutes provide special privileges

variously for a "bona fide student," 8 U.S.C. § 1101(a)(15)(F)(i), for a father with a "bona fide parent-child relationship" with a child, 8 U.S.C. § 1101(b)(1)(D), for a "bona fide member of the crew" of a vessel, 8 U.S.C. § 1287, or for employees of a "bona fide United States incorporated nonprofit organization," 8 U.S.C. § 1430(c). While the purposes of those who claim to fit into these categories may be relevant to a determination of their *bona fides,* the status of each would seem to turn at least substantially on objectively verifiable characteristics.

Bona fide occupational qualifications for employment, which serve as exceptions to our employment discrimination laws, *see* 29 U.S.C. § 621, 42 U.S.C. § 2000e–2(e), work similarly. For a qualification to be bona fide, an employer must show not only that it is necessary but the facts must support its "reasonable necessity" and the inability to accomplish the same purpose through a less discriminatory means. *See Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (interpreting Title VII); *Western Air Lines v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 2751–53, 86 L.Ed.2d 321 (1985) (interpreting Age Discrimination in Employment Act).

A review of the fourteen code sections that use the phrase "bona fide offer" does not provide a definite meaning. Some refer to a "bona fide offer of employment," providing for special relocation benefits to those who have accepted such an offer under certain circumstances, *see* 29 U.S.C. § 1653; 19 U.S.C. § 2298(b), or denying benefits to those who have rejected them, *see* 42 U.S.C. § 607(b). In these contexts, Congress does not appear to use the phrase in connection with any notion of price level.

In many other contexts, however, Congress uses the phrase "bona fide offer" in tandem with some specified notion of market value. *See, e.g.,* 16 U.S.C. § 544f(*o*) (conservation area rules limiting use of property do not apply to unpurchased land for which owner has made "bona fide of-

---

**6.** According to a computer search of the United States Code, 369 sections of the Code contain the phrase "bona fide."

fer" to sell to government; offer "shall not be considered bona fide" if owner refuses consideration equal to the fair market value); 45 U.S.C. § 748(e) (in complicated statutory scheme governing abandonment of rail-line by bankrupt railroad company, company must sell if it receives "bona fide offer" for 75% of appraised value of line); 10 U.S.C. § 9512(e)(2)(D) (Secretary of Defense may reimburse private owner of aircraft modified to be able to serve as cargo plane if needed by government if resale of plane pursuant to "bona fide, arm's length transaction made to the highest bidder" is for a price less than fair market value of non-modified plane). We acknowledge that the coupling of "bona fide offer" with some particular statement of value could suggest that "bona fide" conveys a solely independent meaning. We believe, however, that we read these statutes more fairly by deducing that Congress generally intends the *bona fides* of an offer to be determined in accordance with some level of fair market value.

Section 3604 of Title 42 U.S.C., which does not explicitly define bona fide in some relation to "fair market value," supports this view. That section makes it illegal "to refuse to sell or rent after the making of a bona fide offer ... a dwelling to any person because of race, color, religion, sex, or national origin." Because a property owner who refused to rent or sell a property because of a below-market price would not engage in discrimination, an offer that did not meet the market price would assumedly not be a bona fide offer.

Notwithstanding the helpful guidance of these sections, they primarily establish that the phrase "bona fide" gains meaning from its statutory context. We must therefore derive the meaning of bona fide offers to sell under the PMPA from that statute's legislative purpose.

As we have discussed, the overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship. Because of the distributor's need to adjust to changing market conditions, however, Congress permitted distributors to end the franchise relationship for legitimate business reasons. Yet in doing so, distributors still deprived franchisees of their reasonable expectations. The bona fide offer provision therefore serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.

Permitting the distributor to set an offer price as high as it wished would not provide this second layer of protection because the distributor's business plans may lead it to wish to retain the property. Distributors would set offer prices that compensated them fully for the loss of their business plans. Alternatively, distributors would set an even higher price if they thought the franchisee would pay it. The special desire of a franchisee to maintain the property with which he has worked is exactly what produces the distributor's general bargaining advantage. Either price, a price reflecting the distributor's desire to pursue its business plans or a price reflecting the franchisor's special commitment to the property, might fail to compensate the franchisee for the loss of his reasonable expectation of renewal.

■ To protect the interests of franchisees, we believe that the statute effectively requires the distributor to set an offer price ignoring both its own alternative business plans and the special needs of a franchisee to hold on to the property. Rather, the statute requires the distributor to make an offer as if it "actually" wanted to sell the property (not necessarily to the franchisee but to someone). With such a desire, however, the distributor would set an offer price at fair market value. That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

### B.

Having stated this requirement, we must now decide in what manner courts should scrutinize the distributor's offer to deter-

mine whether it complies with the requirement. In *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005, 1008 (3d Cir.1985), we defined "bona fide" in the context of the PMPA provision permitting nonrenewal of a franchise because of "bona fide customer complaints" to mean "sincere and having a reasonable basis in fact." We similarly here are guided by Congress's decision not actually to use the term "fair market value" but instead the term bona fide, which suggests some degree of deference. That choice indicates, we believe, a recognition that "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3d Cir.1975) (quoting other cases). "[T]here is no universally infallible index of fair market value." *Id.* There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

On the other hand, a standard of scrutiny that simply focused on whether the distributor believed its offer to represent fair market value would leave the franchisee open to injury through sloppiness or mere error. Such a focus might also prove difficult to apply, for intentions are always difficult to discern, especially when we deal not with the intentions of individuals but of organizations.

■ We therefore believe that courts should scrutinize the distributor's offer in a manner similar to that we adopted in *Robertson.* Courts should determine first if the distributor believed its offer price represented fair market value. Even if the distributor did have that sincere belief, however, courts should also determine whether the estimate was objectively reasonable. i.e., whether the offer approached fair market value.[7]

### V. *The Need for Remand*

■ In this case, our disagreement with the district court is narrow. The district court found that Amoco sincerely believed its offer to be at fair market value. Slatky has pointed to considerable evidence that might support a contrary finding, in particular to apparently sloppy appraisal methods and to pressures placed on the appraisal department by the district manager, Lemuel Warfield, that resulted in a higher price. However, the district court's finding on the sincerity of Amoco's belief is not clearly erroneous.

■ The district court also found that the "procedures" used by the Amoco employees were reasonable, and upon this finding, it apparently risked its judgment that the offer had a reasonable basis in fact.[8] The mere following of reasonable procedures, however, does not necessarily result in a reasonable estimate. To determine whether the estimate was reasonable, the district court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them.

Slatky presented evidence that the land appraisal was based on out-of-date and inappropriate comparables and that the improvements appraisal did not represent local costs. Slatky also presented the testimony of independent appraisers that disa-

---

7. While we have held that sincere belief and objective reasonableness (as defined) are essential elements in the determination of the *bona fides* of an offer, we do not thereby exclude the possibility that there may be other relevant factors. For example, an offer approaching fair market value might be hedged with unreasonable conditions of sale.

8. Exactly what the district court meant by the reference to the appraiser's "procedures" in this context is unclear. The full sentence reads: "Although Mr. O'Dell and Mr. Bogdanowicz did not apply formal appraisal techniques, the pro-

cedures used by them were reasonable." 626 F.Supp. at 1226. In context, the reference appears to refer to broader techniques of appraisal. It cetainly does not refer to the actual choice of comparables, the measurements of them, or the formula for relating one comparable to another.

The district court's standard of "reasonableness" is also unclear. The court suggested that the procedures were reasonable so long as the offer "was not arbitrarily made." *Id.* We do not believe that an offer is reasonable whenever it is not arbitrary. A reasonable offer must be one that approaches fair market value.

greed markedly with the evaluations of Amoco. Indeed, Amoco's own appraiser, apparently hired for trial preparation, valued the property $31,000 less than the amount offered by Amoco. The district court should have evaluated these specific challenges. In the face of an apparent congruence of independent appraisals that Amoco's estimate was considerably too high, the court had an obligation to state clearly why it found the Amoco estimate objectively reasonable.[9]

Because the district court failed to find objective reasonableness (in addition to a belief that the property was offered to the franchisee at fair market value), the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The district court will have to make further fact findings. We leave it to the discretion of the district court whether to reopen the record.

MANSMANN, Circuit Judge, dissenting.

I respectfully dissent. I disagree with the majority's position regarding what evidentiary burden a franchisor must meet to establish that an offer is bona fide, and what evidence a franchisee may introduce in order to raise a triable issue of fact on the bona fides of an offer to sell the franchise premises. The statute puts the good faith of the franchisor at issue, not the market value of the franchise property. Reliance on the opinion of a certified, independent appraiser would be competent evidence of the franchisor's good faith in arriving at its offering price. However, nothing in the statute supports the majority's intimation that, in every case, an independent appraisal is required as part of the franchisor's initial evidentiary burden and that the district court is required to make an independent determination of fair market value.

I believe that once the franchisor has established that it has arrived at its offering price in accordance with its usual appraisal practices, it is entitled to an inference that the offer was made in good faith,

i.e., that the franchisor's usual appraisal practices produced a price which the franchisor reasonably believed represented the value of the property. The burden would then shift to the franchisee to raise a triable issue of fact with regard to the franchisor's good faith.

I.

Congress enacted Title I of the PMPA to remedy the disparity of bargaining power which enabled a petroleum franchisor to obtain the right to terminate a franchise relationship for minor contract violations or changes in circumstances. Evidence at Congressional hearings demonstrated that franchisors used the prospect of nonrenewal to compel franchisees to comply with the franchisor's marketing policies, and frustrated the reasonable renewal expectations of franchisees through arbitrary and discriminatory cancellations. *See generally* S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, *reprinted in* 1978 U.S.Code Cong. & Ad. News 873, 875–77 (the "Senate Report"). In order to strengthen the bargaining position of franchisees, Congress drafted Title I to prohibit a franchisor from terminating or failing to renew a franchise agreement except on grounds specified in the statute. The statute also requires written notice of the franchisor's intent to terminate or fail to renew. 15 U.S.C. § 2804(a).

The legislative history of the PMPA recognizes an essential legislative purpose to provide statutory grounds for termination and nonrenewal which would not be "so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and nonrenewals or to prevent fulfillment of the reasonable renewal expectations of the franchisees." Senate Report at 18, 1978 U.S.Code Cong. & Ad. News at 877. Yet, a competing legislative concern was expressed for "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee." *Id.* at 19, 1978 U.S.Code Cong. & Ad.News at 877. Congress also

9. We do not suggest that any one valuation method is appropriate.

recognized the particular importance of providing "adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Id.*

The statutory grounds for termination or nonrenewal reflect Congress' attempt to strike a balance among these competing concerns. Permissible grounds for either termination or nonrenewal include specific courses of conduct of the franchisee, events such as fraud or bankruptcy, and agreement of the parties, or the franchisor's determination to withdraw from the geographic area. *See* 15 U.S.C. §§ 2802(b)(2)(A)–(E). Customer complaints, failure of the franchisee to operate the franchise in a safe and sanitary manner, and failure by the parties to agree to reasonable changes in the franchise agreement are also grounds for nonrenewal. *See* 15 U.S.C. §§ 2802(b)(3)(A)–(C). A franchisor may also fail to renew a franchise if he decides "in good faith" and "in the normal course of business" to convert the premises to another use, to materially alter the premises, to sell the premises, or that the franchise is uneconomical. 15 U.S.C. § 2802(b)(3)(D).

To establish a prima facie case under the enforcement provisions of the PMPA, the franchisee need only establish a termination or nonrenewal of a franchise agreement. 15 U.S.C. § 2805(c). The franchisor then has the burden of going forward with evidence to establish as an affirmative defense that the termination or nonrenewal was permitted under the statute. *Id.* When the decision not to renew is based upon one of the business judgments permitted under § 2802(b)(2)(E) or (b)(3)(D), the franchisor must also establish in defense that the determination was not for the purpose of converting the premises to operation by employees or agents of the franchisor for the franchisor's own account, 15 U.S.C. § 2802(b)(2)(E)(ii) and (b)(3)(D)(ii), and that it has complied with the notice

requirements of the statute, 15 U.S.C. § 2804.

The statutory section in dispute here provides that once a franchisor has made an economic determination not to renew a franchise agreement in accordance with the statute and has notified the franchisee of its decision not to renew, the franchisor must make to the franchisee a "bona fide offer" to sell or otherwise transfer the franchisor's interest in the marketing premises or grant a right of first refusal of an offer made by another. 15 U.S.C. §§ 2802(b)(2)(E)(iii), (b)(3)(D)(iii).

The parties agreed that the PMPA places upon the franchisor the burden of proving its compliance with the statutory requirements including the fact that its offer was "bona fide." The parties stipulated that Amoco's ground for nonrenewal of Slatky's franchise was a business decision permitted by the statute and that the franchisor had complied with the notice requirements of the statute. Section 2802(b)(3)(D)(iii) is the applicable provision requiring a bona fide offer, and the parties parted company over the definition of "bona fide" to be applied here.

After a bench trial, the district court rendered judgment for Amoco.[1] In seeking to ascertain the correct legal standard to apply, the district court relied on our decision in *Robertson v. Mobil Oil Corp.*, 778 F.2d 1005 (3d Cir.1985), in finding that Amoco's offer to Slatky was bona fide. In *Robertson* we defined bona fide in the context of a different section of the PMPA, namely § 2802(b)(3)(B) which allows termination or nonrenewal of a franchise based on "bona fide" customer complaints. We there defined a bona fide complaint as "sincere and having a reasonable basis in fact." *Id.* at 1008.

The district court concluded that Amoco's offer was reached in a reasonable manner, in the normal course of business, by Amoco's employees who appraise any prop-

1. Amoco had counterclaimed for damages caused by the plaintiff's possession of the service station beyond the lease expiration date. Relying on the parties' pretrial stipulation to maintain the status quo pending the outcome of the trial, the district court entered judgment in favor of the plaintiff on the counterclaim.

erty Amoco intends to buy, sell, or lease and who followed procedures normally used for evaluating any of Amoco's property for sale. The court found that "although [Amoco's real estate manager] was requested to reappraise the land which resulted in a higher valuation, there is no evidence that he was directed to increase his appraisal." The court relied upon these findings in concluding that the offer had a reasonable basis in fact. The district court made no finding of fact regarding whether the offer approached the fair market value of the marketing premises as determined by an independent appraisal, but the court found the offer to be sincere in that the property was offered at what Amoco believed was the fair market value. The court rejected the argument of the plaintiff that in order for the franchisor to meet its statutory obligation of proving a bona fide offer under the PMPA, the franchisor must demonstrate that its offer equals or approaches a fair market value as determined by an independent appraiser.

On appeal, the plaintiff argues that the district court erred first in finding that Amoco's valuation procedures were reasonable, and second, in applying a legal standard which did not require an independent consideration of the fair market value of the marketing premises.

Our review in cases of statutory construction is plenary. *Chrysler Credit Corp. v. First National Bank Trust Company of Washington*, 746 F.2d 200, 202 (3d Cir.1984); *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981). Findings of fact should stand unless clearly erroneous. *See Leeper v. United States*, 756 F.2d 300, 308 (3d Cir. 1985).

## II.

Neither the statute itself nor the legislative history of the PMPA provides us with an explicit definition of "bona fide." In *Robertson* we arrived at a definition of bona fide suited to the particular statutory context of the PMPA—namely, that Congress intended "bona fide" customer complaints to be "sincere and hav[e] a reason-

able basis in fact." *Robertson*, 778 F.2d at 1008. Our present task is to determine precisely what our *Robertson* definition requires in the context of offers to sell leased marketing premises pursuant to § 2802(b)(3)(D)(iii) of the PMPA.

The avowed purpose of Title I of the PMPA "is the establishment of minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." Senate Report at 15, 1978 U.S.Code Cong. & Ad.News at 873. Congress implemented its objective primarily by delineating clearly the grounds on which the franchisors may terminate or refuse renewal of an existing franchise. *See* 15 U.S.C. § 2802. As discussed above, the remedial scheme of the statute attempts to balance the franchisee's relative lack of bargaining power and reasonable renewal expectations against the legitimate property rights and economic interests of the franchisor. *See* Senate Report at 18–19.

I agree with the majority that protection of the franchisee requires that the franchisor behave as though it truly wished to sell the franchise premises. Thus, consistent with *Robertson*, for an offer to be bona fide the appraisal upon which it is based must have a reasonable basis in fact. I disagree with the majority's view regarding what role the concept of "market value" should play in the court's determination of whether the franchisor has conformed to the bona fide offer.

The majority implies that a franchisor may not meet its burden of proof to establish the bona fide offer element of its defense without affirmatively establishing, in addition, that its offering price was "objectively reasonable," measured by the degree to which the offer "approach[es] fair market value" as determined by an independent appraiser and by the district court. The majority effectively requires the franchisor to introduce evidence that it relied upon the opinion of an independent appraiser in arriving at its offering price. The majority would then further require that the district court make an independent de-

termination of the acceptable range of fair market values for the franchise premises. I disagree. I find no basis in the PMPA for imposing the majority's objective evidentiary standard.

The statutory construction process must look in the first instance to the plain meaning of a statute's terms. *See National Freight v. Larson*, 760 F.2d 499, 503 (3d Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985). "The common legal definition of bona fide, consistent with the non-legal definition, is '[i]n or with good faith; honestly, openly, and sincerely ... real, actual, genuine, and not feigned.'" *Robertson*, 778 F.2d at 1008, *quoting* Black's Law Dictionary (5th ed. 1979). In a legal context, the term bona fide looks almost exclusively to subjective good faith. For example, a bona fide purchaser, a bona fide holder for value, a bona fide mortgagee or a bona fide possessor of property may be party to illegal transactions yet exempt from liability because the action was taken in subjective good faith irrespective of another's prior or superior claim of right to the property. Additionally, nothing in § 2802(b)(3)(D)(iii) requires a franchisor to offer to sell, transfer, or assign its interest in the leased marketing premises for a price which in fact approximates fair market value. We must presume, accordingly, that Congress, in prescribing a bona fide offer did not necessarily intend to equate the franchisor's good faith with an enforcing court's independent determination of fair market value.

No express statutory language governs what evidence may inform the bona fides of an offer. I believe the concept of a bona fide offer as utilized in § 2802(b)(3)(D)(iii) contemplates subjective good faith, *i.e.*, is undertaken without a motive or purpose to discriminate against the franchisee, which may be objectively evidenced through the use of the franchisor's normal procedure for appraising property for sale. The position of § 2802(b)(3)(D)(iii) in the statutory remedial scheme suggests that the franchisor's decision as to an offering price should be subject to a standard of intent similar to that which governs economic determinations which may support a decision

not to renew a franchise. Under the PMPA, the requirement to offer the property for sale is triggered by the franchisor's reliance upon grounds for nonrenewal set forth in § 2802(b)(3)(D), which involve economic decisions regarding marketing strategy or recommitment of resources. There is nothing in the statute to indicate that compliance with § 2802(b)(3)(D)(iii) demands anything more than what is required for compliance with the sections which trigger its applicability. The standard governing those economic decisions is that they be made "in good faith and in the normal course of business." §§ 2802(b)(3)(D)(I)–(IV).

We may reasonably assume that through its ordinary valuation procedures a franchisor will determine a selling price which it considers to be market value and that the valuation will, as a result, have a reasonable basis in fact.

The fact that ordinary business procedures are not expressly required by the language of the section under consideration does not mean that a decision in the ordinary course of business may not evidence a bona fide offer. The absence of the express requirement of normal procedures merely suggests that other courses of conduct, *e.g.*, the use of outside appraisers even if not the franchisor's usual practice, could evidence good faith as well. I find nothing in the PMPA which requires the franchisor to offer its interest in the marketing premises to a current franchisee at a price which is any less than the franchisor would expect to receive from a third party purchaser. Section 2802(b)(3)(D)(iii) (II) contemplates that the franchisor might actively solicit bids or offer the marketing premises at a given price to the public at large. The section requires only that the franchisor must "offer[] the franchisee a right of first refusal ... of an offer, made by another, to purchase such franchisor's interest in such premises."

The purposes of the statute would be served by defining a bona fide offer to sell as an offer to sell the fully operative marketing premises, which offer is the same as that which the franchisor would make to

any prospective buyer and based upon a valuation of the marketing premises arrived at through the normal procedures used by the franchisor in informing its decision at what price to offer any of its property for sale. Initially, therefore, the franchisor need carry the evidentiary burden to show that the franchisor arrived at its asking price through the normal appraisal procedures employed in the buying and selling of any of its property. Such a showing would presumptively satisfy our *Robertson* requirement of a sincere offer reasonably based in fact.

If the franchisor met its initial evidentiary burden, the franchisee could then introduce evidence of any arbitrary or discriminatory variation from the franchisor's normal business practices. If as Slatky complains, the franchisor did not really desire to sell the premises and inflated the selling price to prevent a sale, the franchisee could challenge the bona fides of the offer, for example, by introducing evidence to controvert the facts supporting the appraisal, the inferences drawn from them, on any unexplained inflation of the appraisers' figures in arriving at an offering price.

### III.

I part company with the majority's suggestion that the mere fact that independent appraisers arrived at a different opinion of the value of the property raises an issue of fact as to the bona fides of the franchisor's offer.

Market value is merely a matter of opinion until the subject property actually changes hands. *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975).[2] As the majority recognizes, there may be a range of prices

with reasonable claims to being fair market value. Consequently, a test of Amoco's bona fides cannot require more than that it relied on a well-founded opinion as to the market value of the franchise property, *i.e.*, whether Amoco reasonably believed its offer to be at fair market value, the standard applied by the district court. This conclusion fully comports with the Congressional aims expressed in the overall scheme and legislative history of the PMPA.

Slatky cites *Tobias v. Shell Oil Co.*, 782 F.2d 1172 (4th Cir.1986), and *Brownstein v. Arco Petroleum Products Co.*, 604 F.Supp. 312 (E.D.Pa.1985), as squarely holding that a "bona fide offer" must approach fair market value. The plaintiff, however, misplaces his reliance on these authorities. In *Brownstein*, the plaintiff attacked the *bona fides* of Arco's offer to sell him the franchise premises at a price sixteen percent above the value Arco's appraiser had assigned to the property. Since Arco could not demonstrate why it inflated its appraiser's figures, the district court held that the offer was not in conformity with the offeror's general practice for selling property, and was therefore not bona fide. *Id.* at 316. This result conforms to our analysis.

We note that the district court stated that:

> Even had Arco demonstrated that the procedures by which it arrived at the offering price were consistent with those utilized in non-PMPA-restricted cases, I am not convinced that it would have satisfied the strictures of the Act.... [A] proper reading of the Act compels the conclusion that for an offer to be bona fide—that is *actual*—it must meet or very nearly approach what the offeror believes to be the fair market value of the property [footnote omitted].

**2.** In *Amerada Hess Corp. v. Commissioner,* we cited the classic formulation of fair market value: "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.'" *Id., citing United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), *quoting* Treas. Reg. § 20.2031–1(b). We also noted that "'the word "value" almost always involves a

conjecture, a guess, a prediction, a prophecy.'" *Amerada Hess Corp.,* 517 F.2d at 83, *citing Andrews v. Commissioner,* 135 F.2d 314, 317 (2d Cir.), *cert. denied,* 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943), *quoting Commissioner v. Marshall,* 125 F.2d 943, 946 (2d Cir.1942). Furthermore, "there is no universally infallible index of fair market value." *Amerada Hess Corp.,* 517 F.2d at 83. The supposedly objective standard of fair market value is, therefore, subject to a host of variables.

*Id.,* emphasis in original. A close reading of *Brownstein* shows it to be consistent with Amoco's, not Slatky's, position. Even the court's dicta tested "what the offeror *believes* to be the fair market value of the property [footnote omitted]." *Id.,* emphasis added. The trial judge here specifically found that Amoco believed its offer to reflect fair market value. Even under the *Brownstein* analysis, therefore, Amoco has satisfied the bona fide offer requirement of the PMPA.

The opinion of the Court of Appeals for the Fourth Circuit in *Tobias* offers little help to us here. In *Tobias* the fair market value of the premises was undisputed and, in fact, the franchisor's sale price approached fair market value. *See Tobias,* 782 F.2d at 1174. The court was not faced with the problem we have here.

In sum, neither the express language nor the legislative history of § 2802(b)(3)(D) requires a franchisor's "bona fide offer" to approach fair market value as determined by the court or by an independent appraiser. I conclude that the PMPA's requirement of a "bona fide offer" contemplates, at a minimum, that the franchisor should follow its general practice for selling property. The franchisor, of course, may demonstrate its good faith by means of an independent appraisal of fair market value if it so wishes, but nothing in the Act or its history requires such a course.

### IV.

Applying the legal standard enunciated above to the facts as found by the district court, I would hold that Amoco's offer to sell the premises was "bona fide." The district court properly found the franchisor's offer to be bona fide because the offeror arrived at its opinion of the value of the property in accordance with its normal procedures and offered to sell the property to the plaintiff at a price based upon that appraisal. In my view the trial court had discretion to credit the testimony of Amoco's employees with respect to Amoco's good faith in arriving at what they perceived to be a fair offering price.

Amoco's employees were qualified to form and express an opinion as to the value of the franchise property. A substantial and sufficient basis for the expression of that opinion appears in the record. The record establishes that the employees are acquainted with the property and are informed about the state of the market. The weight and credibility of their evidence was for the factfinder.

Eugene O'Brien, Manager of Projects for the North East United States, testified that out of 40 years of employment with Amoco approximately 38 were spent in real estate related positions involving extensive on-the-job experience as well as seminars and training courses. In 1985 his project team was responsible for $6.5 million in sales of properties. He testified about the company's procedures for determining an offering price and the employment of those procedures in this case. He affirmed that the procedures used in this case were the same as those employed by Amoco throughout the history of his employment with them. He further testified that Amoco's general procedure for determining the offering price of property is to conduct an initial appraisal of the land and real estate improvements by its own employees. That appraisal is then reviewed by a real estate manager and project team director. If the review raises questions, the property is reappraised or the appraisal is otherwise corrected. A selling price is then determined by Amoco's capital asset manager.

Melvin O'Dell, the capital investment representative for that area who prepared the appraisal of the land value, testified that he had been a capital investment representative for 25 of his 33 years with Amoco and had spent the first 8 years with Amoco in other real estate related positions. His duties and responsibilities for the past 25 years have been to buy, sell, lease and appraise Amoco properties in Pennsylvania and the four adjoining states. He testified to extensive on-the-job training, numerous appraisal seminars and a real estate license. He performs roughly 75 appraisals in the course of a year. Factors he relies on include determination of comparable sales in the market area and evaluation of

them in relation to the site being appraised as to size, geographic location, accessibility, overall appeal, zoning, and traffic volume. He makes on-site inspections of the comparable properties and the subject property.

Charles Bogdanowicz, who appraised the improvements, had been, at the time of his testimony, employed by Amoco for 13 years, the last 5 of which were spent as a project engineer. In this capacity he designs facilities to be constructed on various Amoco properties, a job which requires him to estimate the cost of improvements, secure bids, purchase equipment for service station facilities, supervise construction and, approximately twice a month, appraise service station improvements and equipment.

Lemuel Warfield, the Washington, D.C., district manager, testified that based on the number of gallons sold at the subject property Amoco could not purchase a replacement property, i.e., with the potential to pump as many gallons, for the building and land value assigned by Amoco's appraisers. He testified that Amoco would have to pay close to half a million dollars to replace the property. Nevertheless, and despite his protest which resulted only in a closer appraisal of the land value and an increase of $30,000, his opinion that the station was more profitable for Amoco than reflected in the offer was not taken into consideration in arriving at the offering price. Thus, the only evidence of record regarding the matter of "value to Amoco" was that income from alternative uses was not considered by Amoco in setting its offering price.

I would hold that the franchisor's evidence of a price arrived at through its usual appraisal procedures and by experts who are qualified to testify as to the value of the property raised an inference that the franchisor believed it was offering the premises to the franchisee at a fair price. This inference satisfied the burden of proof as to the franchisor's good faith defense unless the plaintiff was able to raise an issue of fact as to the franchisor's good faith. I do not believe the franchisee met

this burden simply by introducing evidence of lower appraisals. Something more persuasive would be required than evidence that other appraisers were of a different opinion.

Under the majority's analysis, an independent appraisal of market value would be the only way to determine good faith. Reliance upon the opinion of a qualified independent appraiser would be persuasive evidence of a franchisor's good faith but it certainly would not be conclusive. The opinions of independent appraisers and the reasonableness of the franchisor's reliance upon them would be subject to testing and scrutiny by cross-examination and, as with the employee appraisers, the district court would have to decide what weight to give their opinions.

The majority also insists that the district court must focus on the specific facts used by the Amoco appraisers in their evaluation and the inferences made from them. I agree, but only to the extent that the franchisee is able to produce evidence to raise an issue of fact. The only fact placed in issue by the plaintiff here was that O'Dell's original appraisal of land value had been based on a considerable underestimation of the square footage of the principal comparable property, the Turkey Hill Market site. O'Dell, however, corrected the figures in his second appraisal and testified that he had determined that the underestimation would not change his estimate of the value of the subject property because even with the additional square footage the Turkey Hill site was considerably smaller than the franchise premises and was not adapted to as many uses.

The majority holds that where the franchisor introduces evidence of independent appraisals which are considerably lower than the franchisor's offer, the district court must state clearly why it finds the franchisor's offer to be objectively reasonable. Since, as the majority admits, the franchisor's good faith, and not the precise market value of the property, is the ultimate statutory issue, I do not believe the franchisee raises a triable issue of fact simply by introducing evidence of lower

appraisals. Something more persuasive would be required than evidence that other appraisers arrived at a different figure.

The plaintiff might, for example, place the franchisor's good faith in issue by offering persuasive evidence that the franchisor did not follow its usual procedures or employ its usual criteria or that the franchisor's witnesses were not competent to testify concerning the value of the property, *i.e.*, that the figures developed by the franchisor's appraisers or adjustments to their figures were based on speculation, guess, or conjecture. If the employees did not know or consider some of the factors ordinarily used by certified appraisers, they may be asked to relate the details of their training and experience which justified them in disregarding the factors ignored.

The majority seizes upon the argument that O'Dell used out-of-date and inappropriate comparables in making his land value appraisal. However, the plaintiff introduced no evidence that better comparables were available. Plaintiff's expert testified that his best comparable was a site known as the Turkey Hill Mini-Mart which O'Dell also used as his principal comparable. The plaintiff's experts both testified on cross-examination that there were no recent sales of property for use as a service station in the area.

The majority also finds suspect the fact that Mr. O'Brien, after receiving O'Dell's first land estimate of $155,000, requested that O'Dell reevaluate the property. O'Dell then secured current traffic volume figures for the subject property and each comparable, determining the current zoning status of each and studying the residential areas encompassing the marketing areas of all three comparables and the subject property; he thereupon increased his land appraisal to $185,000.

The plaintiff also faulted O'Dell for failing to rely on comparables he had selected personally. However, O'Dell testified that he was familiar with the work of the prior appraiser, found him to be thorough and exacting and was comfortable in relying upon his selection of comparable properties. The plaintiff's arguments go only to the weight and credibility of O'Dell's testimony, a subject properly within the discretion of the trial court.

The majority also suggests that the improvements' appraisal did not represent local costs. Bogdanowicz, however, testified from his experience with new construction in Pennsylvania, Delaware, New Jersey, Maryland, and particularly in Harrisburg, that he would conclude that the construction costs in the Harrisburg area are comparable to the Philadelphia area where he had done most of his construction during the last three years.

The arguments made by the plaintiff and adopted by the majority are in essence challenges to the methods used by the Amoco appraisers. Whatever suspicions the majority might have as to Amoco's good faith, there is no *evidence* that the appraisal is speculative. The facts supporting Amoco's appraisal were virtually unchallenged, and there is no evidence that the conclusions drawn from that data were incorrect. Nor is there any basis in fact to assume that an independent appraiser could value franchise property more accurately than could its present owner. The fact that the appraisers were employed by the defendant may also affect the weight of their testimony. Nevertheless, questions as to weight and credibility are for the factfinder, and we may not remand simply on the basis of our own speculation.

Even in cases where the facts will admit of more than one opinion, it is the province of the factfinder to choose among them. In this case, however, such a choice is not necessary. The defendant's burden is to prove good faith. If the data will support the franchisor's opinion as to the value of the property, the franchisor may not have proved market value, but it has proved good faith. This is true even if the facts will also reasonably support another opinion as to market value.

The district court specifically found that the procedures outlined by O'Brien are those followed by Amoco in the valuation of any property Amoco intends to buy, sell or lease. In addition, the court found that in this case Amoco did follow its customary

**494**

business procedures in arriving at an offering price to Slatky. The record clearly indicates that Amoco's appraisers were capable of forming an intelligent opinion derived from an adequate knowledge of the nature and kind of property in controversy and of its value. The district court noted that Amoco's appraisers showed precisely how they arrived at their respective appraisals. The district court found that the franchisor sincerely believed its offer to be at fair market value. The majority agrees that this finding is not clearly erroneous. No further findings were necessary to support the conclusion that the offer was bona fide.

The facts found by the district court support the decision that Amoco has fulfilled its statutory obligation to make a bona fide offer to sell the marketing premises to Slatky. Therefore, I would affirm the judgment of the district court.