**Byron C. DARLING, III,**
**Plaintiff–Appellant,**

**v.**

**MOBIL OIL CORPORATION,**
**Defendant–Appellee.**

**No. 1296, Docket 88–7209.**

United States Court of Appeals,
Second Circuit.

Argued June 23, 1988.

Decided Jan. 4, 1989.

Richard W. Farrell, Stamford, Conn. (Albert J. Barr, Farrell & Barr, Stamford, Conn., of counsel), for plaintiff-appellant.

. Andrew J. Kilcarr, Washington, D.C. (Edward C. Duckers, Hogan & Hartson, Washington, D.C., of counsel), for defendant-appellee.

Dimitri G. Daskalopoulos, Washington, D.C., filed an amicus curiae brief for Service Station Dealers of America, Inc., Fair Franchising Coalition, New York State Assn. of Service Stations, Long Island Gasoline Retailers Assn., Tri State Gasoline and Automotive Retailers Assn. of Maine, New Hampshire and Vermont.

Before NEWMAN, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal from cross-motions for summary judgment requires an examination of the relationship between the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2841 (1982) (PMPA or the Act), and the Connecticut Gasoline Dealer's Act, Conn.Gen.Stat. § 42-133j-42-133n (1987) (Connecticut Act), in the context of the termination of a retail franchise agreement. The PMPA was enacted in 1978 primarily to prevent arbitrary terminations and nonrenewals of such franchises. Enacted under the state's police powers, the 1977 Connecticut Act is also designed to regulate certain aspects of franchise agreements, including terminations and nonrenewals.

Each enactment recognized the David versus Goliath aspect of the relationship between the small retailer franchisee and the giant petroleum company franchisor, and aimed at making that relationship more equal. In so doing, the federal act does not purport to tie the "giant's" marketing hands or to put it at a competitive disadvantage in the petroleum franchise business. The Connecticut Act, in contrast, is more protective of franchisees and more skeptical of franchisors than its federal counterpart. It is our task on this appeal to give effect to these competing statutory objectives.

The threshold issue is whether the federal statute, 15 U.S.C. § 2802(b)(2)(A) and (b)(2)(B), under which Mobil Oil Corporation (Mobil) seeks to terminate its franchise agreement with Byron C. Darling III (Darling), controls this case and authorizes such termination because of Darling's failure to operate his service station 24 hours-a-day. Darling's principal defense to termination is a provision of the Connecticut Act. *See* Conn.Gen.Stat. § 42-133*l*(e). A second issue, assuming federal law controls, is whether Mobil's purported termination complies with the Act.

### BACKGROUND FACTS and PRIOR PROCEEDINGS

Mobil has terminated Darling's retail franchise agreement based on his failure to operate the gasoline station according to the hours of operation provision of the agreement. The material facts as found by the district court are not contested. In November 1985 Darling purchased an interest in the Mobil service station franchise

located at 33–35 Grassy Plains Street in Bethel, Connecticut, and became a Mobil franchisee. To operate a Mobil service station pursuant to a franchise agreement, a franchisee leases the land and the station from Mobil. In this case Darling purchased a prior franchisee's lease that ran from August 1, 1985 through July 31, 1988. The lease contained a provision that obligated the franchisee to operate the station 24 hours-a-day, seven days-a-week. Darling and Mobil discussed the 24–hours provision prior to Darling's purchase, but made no change in the agreement. Darling was aware of provisions in the Connecticut Act that prohibited franchise terminations for failure to operate the station between 10:00 P.M. and 6:00 A.M., if the station was certified as unprofitable during those hours. He initialed the 24 hours-a-day, seven days-a-week provision in the lease, and operated Grassy Plains Mobil on that basis from mid-December 1985 through mid-February 1986. Operations from 10:00 P.M. to 6:00 A.M. over these two months resulted in continuous financial loss during those hours. As a result, Darling advised Mobil in mid-February that he would cease to stay open round-the-clock. Throughout 1986 Mobil periodically advised him that failure to operate the station 24 hours-a-day violated the agreement and constituted grounds for termination of the franchise.

On December 23, 1986 Mobil formally notified Darling that his franchise would be terminated if he failed to implement the 24 hours-a-day provision. In response, Darling commenced the instant action on January 19, 1987 seeking injunctive and monetary relief and a declaratory judgment against Mobil that termination of his franchise agreement for failure to operate 24 hours-a-day is unlawful under the Connecticut Act and the PMPA. On March 5, 1987 Mobil terminated Darling's franchise pursuant to paragraph 5 of the lease and in accordance with §§ 2802(b)(2)(A) and (b)(2)(B) of the PMPA. It also counterclaimed in Darling's action seeking declaratory, monetary and injunctive relief for Darling's alleged violation of the PMPA and for his breach of contract.

Both parties moved for summary judgment. On March 2, 1987 the district court granted Mobil's motion for summary judgment, holding that the PMPA preempted the pertinent provisions of the Connecticut Act. It relied heavily on *Mobil Oil Corp. v. Karbowski*, 667 F.Supp. 927 (D.Conn. 1987), which was decided after commencement of this action. The district court further ruled that the reasonableness standard for termination set forth in § 2802(b)(2)(A) was "a subjective standard, in this instance evaluated principally from the perspective of the franchisor." Darling appeals the district court's grant of summary judgment to Mobil.

### THE PMPA

To put the issues before us in proper perspective, it is necessary to review the purposes which prompted the passage of the PMPA and the Connecticut Act. In order to assess the PMPA's preemptive effect on state law, it is helpful to (1) "examine the statutory language and legislative history" [of the PMPA], (2) the subject matter of the regulated field and the interest in uniformity, and (3) the pervasiveness of the federal statutory scheme, and (4) the impediments that state regulation might pose to federal objectives." *County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 57 (2d Cir.1984). In broad terms, the PMPA was enacted to establish federal standards regarding the termination and nonrenewal of petroleum marketing franchises. The Act also had more specific objectives.

Its overriding purpose is to establish "protection for franchisees from arbitrary and discriminatory terminations or non-renewals of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874 (*Senate Report*). Congressional hearings confirmed that petroleum distributors had been using the threat of termination to force franchisees to comply with the distributor's marketing policies. Congress recognized that franchisors had used their superior bargaining power and the threat of termination or nonrenewal to gain an

unfair advantage in contract negotiations and disputes. *Senate Report* at 875–77. One of the principal purposes of the PMPA therefore was to correct the disparity of bargaining power and to protect franchisees from arbitrary or discriminatory practices by franchisors. *See Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir.1986); *see also Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir.1987) (*en banc*).

In addition to redressing bargaining disparities and the ill effects that flow from them, Congress also designed the PMPA to achieve two other goals. The second objective was to establish a "single, uniform set of rules" to regulate the grounds for termination and nonrenewal and eliminate the "uneven patchwork of rules governing franchise relationships which differ from State to State." *Senate Report* at 877; *see also* 123 Cong.Rec. 10,384 (daily ed. April 5, 1977) (statement of Rep. Brown). Like the state of Connecticut, a number of states had previously passed legislation addressing problems in the petroleum franchise industry by a variety of methods.

A third goal was to recognize "the legitimate needs of a franchisor" to terminate or not to renew based on misconduct of the franchisee, and to enable the franchisor to respond effectively to changing market conditions in a given geographic region. *Senate Report* at 877; *see also* 123 Cong. Rec. 10,383 (daily ed. April 5, 1977) (statement of Rep. Dingell). Although the PMPA was designed to serve the three goals of correcting disparities in bargaining power, providing nationwide uniformity in franchise relationships and permitting franchisor flexibility—its paramount objective is to redress disparities in bargaining power and to prevent the ensuing arbitrary termination. *See Bellmore*, 783 F.2d at 304–05; *Esso Standard Oil Co. v. Department of Consumer Affairs*, 793 F.2d 431, 434 (1st Cir.1984).

This view of the statute is best demonstrated by examining the language of the Act. In order to effectuate its purposes, Congress barred termination of a petroleum franchise unless it meets specific statutory justifications. Section 2802(b)(1)(B) provides that a termination must be based on a ground set forth in § 2802(b)(2). Thus, a franchise may be terminated after proper notice is given, based on: "A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship...." § 2802(b)(2)(A). Subpart B of the same section similarly permits termination or non-renewal based on: "A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise...." § 2802(b)(2)(B). Either subpart (A) or (B) are sufficient to justify a termination of a franchise, and Mobil relies on both in terminating Darling's franchise.

Another ground for termination found in § 2802(c) is an "event" relevant to the franchise relationship, the occurrence of which makes termination or nonrenewal reasonable. A nonexclusive list of 12 such "events" is set forth in subpart (c); these "events" are deemed "reasonable" *per se* for termination of a franchise agreement under subpart (c). *See* 15 U.S.C. § 2802(c)(1)–(12). As Darling correctly asserts, § 2802(c) does not include the failure to comply with an hours of operation provision as one of the 12 "events" that gives a franchisor a reasonable ground for termination.

These substantive limitations on the franchisor's power to terminate are central not only to the statute's primary remedial purpose, but also to its flexibility objective. The degree of flexibility granted a franchisor is directly related to the construction given to the terms "reasonable" and "material significance" in subpart A and the term "good faith efforts" in subpart B of § 2802(b)(2). Whatever standard is applied to these sections—whether subjective or objective—must give effect to the basic purposes of the Act. The issue of which standard should be applied will be discussed shortly.

The PMPA achieves its uniformity goal through an express and carefully circumscribed preemption provision, which states that:

To the extent that any provision of this subchapter applies to the termination ... of any franchise ... no State ... may adopt, enforce, or continue in effect any provision of any law ... with respect to termination ... of any such franchise ... unless such provision of such law ... is *the same as* the applicable provision of this subchapter.

15 U.S.C. § 2806(a) (emphasis added). By its own terms, this language does not preempt all state laws regulating petroleum franchises. It "preempts only state statutes as to grounds for, procedures for, and notification requirements with respect to termination or non-renewal." *See Bellmore,* 783 F.2d at 304; *see also Exxon Corp. v. Georgia Ass'n of Petroleum Retailers,* 484 F.Supp. 1008, 1017 (N.D.Ga. 1979), *aff'd sub nom. Busbee v. Georgia Ass'n of Petroleum Retailers,* 644 F.2d 1030 (5th Cir.), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981).

### THE CONNECTICUT ACT

The Connecticut Act shares with the PMPA the goal of addressing the disparity of bargaining power in the petroleum franchise field. According to its statement of legislative findings, it is designed "to avoid undue control of the dealer by suppliers" and "to offset evident abuses within the petroleum industry as a result of inequitable economic power." *See* Conn.Gen. Stat. § 42–133j(a).

To further this goal, the Connecticut Act provides that: "No franchisor shall ... terminate ... a franchise, except for good cause shown which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement...." § 42–133*l* (a). Moreover, it defines certain obligations *per se* as not being "material and reasonable" obligations under § 42–133*l* (a), and therefore not permissible grounds for termination. § 42–133*l* (e)(1)–(5). The franchisee's "refusal to keep the premises open and operating during those hours which are documented by the franchisee to be unprofitable to the franchisee or to preclude the franchisee from establishing his own hours

of operation beyond the hour of 10:00 P.M. and prior to 6:00 A.M." are among the prohibited grounds for termination. § 42–133*l* (e)(4).

### DISCUSSION

Having briefly examined the federal and state statutes, we consider the issues on appeal. Those issues are whether §§ 2802(b)(2)(A) and 2806(a) of the PMPA preempt §§ 42–133*l* (a) and (e) of the Connecticut Act and, if so, whether Mobil's termination is one authorized under § 2802(b)(2).

#### I  *Federal Preemption*

Under the Supremacy Clause of Article VI federal law may preempt state or local law in at least three ways. *See, e.g., Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). First, Congress may in express terms declare its intention to preclude state regulation in a given area. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Second, in the absence of an express declaration, preemption may be implied when the federal law is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementing state regulation." *Hillsborough,* 471 U.S. at 713, 105 S.Ct. at 2375 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Of course, "courts should not lightly infer preemption." *International Paper Co. v. Quellette,* 479 U.S. 481, 107 S.Ct. 805, 811 & n. 11, 93 L.Ed.2d 883 (1987); *see also Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,* —— U.S. ——, 108 S.Ct. 1350, 1353, 99 L.Ed.2d 582 (1988). Finally, state law may be preempted "to the extent that it actually conflicts with a valid feder-

al statute." *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). "Conflict preemption" may occur either when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

A determination that federal law preempts a state statute should be reached in a careful and judicious manner to avoid unwarranted disruption of important state policies, such as those reflected in the Connecticut Act. In areas traditionally regulated by state law, "we start with the assumption that the historic police powers of the States were not superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Although § 2806 of the PMPA contains an express preemption clause, its preemptive effect is limited. *See Esso Standard Oil Co.,* 793 F.2d at 434 (PMPA did not preempt an action based on Puerto Rican statute that regulated rents charged to franchisees); *Bellmore,* 783 F.2d at 305 ("PMPA neither expressly or impliedly preempts all state law relating to termination or non-renewal," but rather only those provisions governing "grounds for, procedures for, and notification requirements with respect to termination.").

A state law that makes provision for termination—such as §§ 42–133*l* (a) and (e) of the Connecticut Act—is preempted by the PMPA only to the extent that the state law is not "the same as" the corresponding federal act provisions. *See* 15 U.S.C. § 2806(a); *Bellmore,* 783 F.2d at 305. Thus, we undertake side-by-side comparison of § 2802(b)(2)(A) with §§ 42–133*l* (a) and (e).

■ PMPA § 2802(b)(2)(A) allows a franchisor to terminate a franchise agreement when the franchisee fails to comply with a term that is "both reasonable and of material significance." The Connecticut Act similarly permits termination for a franchisee's "failure to comply substantially with any reasonable and material obligation of the franchise agreement." § 42–133*l* (a). To this extent, the federal and state laws address identical subjects, apply identical tests and are not in conflict, and the state law would qualify under § 2806(a) as "the same as" the federal provision.

■ But, the Connecticut Act goes further than the federal act in protecting the franchisee by enumerating in § 42–133*l* (e) five events that may not constitute reasonable grounds for termination. *See* § 42–133*l* (e)(1)–(5). This list includes the hours of operation provision upon which Darling depends to prevent termination. § 42–133*l* (e)(4). Because of this extra element of protection for franchisees, the state scheme is not "the same as" the federal termination provisions.

Each side invokes the policies that underly the PMPA to support its argument. Mobil argues that § 42–133*l* is impliedly preempted by federal law because application of the Connecticut Act to the franchise termination would frustrate the uniformity and flexibility objectives of the federal law. Mobil argues further that the flexibility objective recognizes the need for franchisors to implement marketing strategies—of which the round-the-clock provision is a part—and that the Connecticut Act would frustrate this end. Darling's rebuttal to this argument points to a different goal of the PMPA: he asserts that the Connecticut Act is fully consistent with the principal aim of the PMPA, the prevention of arbitrary terminations and franchisor abuses that flow from the disparity in bargaining power. The Connecticut Act, he also insists, merely supplements the federal law while remaining true to its purposes. He concludes that the former does not frustrate the purposes of the latter, and hence is not preempted by it.

Both parties' lines of argument are somewhat flawed largely because each down-

plays the importance of one or another of PMPA's policies. In the face of potential conflict, it might plausibly be argued, as Darling does, that our task is to harmonize the state and federal laws to the greatest extent possible. In support of Darling's proposition he cites the legislative history which states that:

It is intended that the harmonizing of these competing interests be left to judicial balancing of competing equities on a case-by-case basis. No hard and fast statutory rule would accomplish the desired goal of harmonizing the competing statutory objectives as equitably as application of general principles ... to specific fact situations.

*Senate Report,* at 901. Yet, such harmonizing should proceed consistently with the purposes of the *federal legislation,* and is particularly useful when the purposes of the state act are consistent with those of the federal act. *See CTS Corp. v. Dynamics Corp.,* 481 U.S. 69, 107 S.Ct. 1637, 1644–46, 95 L.Ed.2d 67 (1987). Darling observes that the PMPA is silent concerning hours of operation. Therefore, he asserts that failure to operate 24 hours-a-day—prohibited as a ground for termination under the Connecticut Act—cannot be an "event" under PMPA § 2802(b)(2)(C) which would trigger the right to terminate. In sum, because in his view the Connecticut Act merely supplements the federal scheme, there is no conflict or physical impossibility in complying with federal and state law.

Although seemingly attractive, the harmonization approach contains two basic problems. First, it fails to recognize the existence of a potential conflict. Section 42–133*l* (e) prohibits the use of certain occurrences as grounds for termination and makes them *per se* unreasonable. The PMPA is silent on the precise issue of whether operation of a station around-the-clock is reasonable or material. Thus, if the hours of operation provision here were construed as a "reasonable and material" term of the franchise agreement under § 2802(b)(2)(A), such a holding would result in creating a direct conflict between federal and state law. *Cf. Mobil Oil Corp. v. Karbowski,* 667 F.Supp. at 935; *Lasko v.*

*Consumers Petroleum of Conn., Inc.,* 547 F.Supp. 211, 216 (D.Conn.1981). Conflict would be avoided only if a 24 hours-a-day provision could never be considered a reasonable and material term of the lease. Thus, insofar as § 42–133*l* (e) makes hours of operation relate directly to grounds for termination, it encroaches upon the PMPA and Congress' uniformity objective. As we stated in *Bellmore,* state laws concerning grounds for termination were precisely what the PMPA aimed to preempt. *See* 783 F.2d at 304–05.

Second, to adopt Darling's harmonization approach ignores the language of § 2806(a), the PMPA preemption clause. Section 42–133*l* (e) of the Connecticut Act determines what is a *per se* unreasonable and immaterial provision and bars termination on those specified grounds. Hence, that section is not "the same as" the corresponding PMPA termination provisions. *Cf.* § 2802(b)(2). The plain meaning of § 2806(a) requires that a state law whose scope differs from the PMPA be preempted.

Darling next suggests that the states may adopt laws more protective of the franchisee because that would further the basic goal of the PMPA. We cannot agree. Not only would this be contrary to § 2806(a) of the PMPA, but it would also be contrary to the Act's uniformity and flexibility objectives. The structure of the PMPA—its open-textured termination and non-renewal provisions, and carefully limited preemption clause-strongly suggest that it was Congress' purpose to have uniform standards for termination and non-renewal. *See* 15 U.S.C. §§ 2802, 2806(a); *see also* 123 Cong.Rec. 10,384 (daily ed. April 5, 1977) (statement of Rep. Brown); 124 Cong.Rec. 12,764 (daily ed. May 5, 1978) (statement of Sen. Jackson) ("The patchwork of these State laws has become a serious encumbrance on the franchisor-gasoline suppliers, so much so that [franchisors] are willing to accept the restrictions ... in return for uniformity of laws across the nation."). For several reasons we are unpersuaded by Darling's contentions.

Although the PMPA termination provisions are designed to ensure that franchisors nationwide do not economically coerce their franchisees, these provisions are to be construed so that franchisors may structure their marketing plans with stabilized expectations. *See Senate Report*, at 877; 123 Cong.Rec. 10,383 (daily ed. April 5, 1977) (statement of Rep. Dingell). State laws at variance with PMPA termination provisions create uncertainty and are an obstacle to development of a uniform and coherent body of federal law. *Cf. Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 163–64, 98 S.Ct. 988, 997–98, 55 L.Ed.2d 179 (1978) (Congressional uniformity objective forecloses "the imposition of different or more stringent state requirements").

Beyond that, there can be no doubt that statements drawn from both houses of Congress demonstrate that the PMPA was designed to afford some flexibility to franchisors to make legitimate business decisions. *See Senate Report, supra* at 877; 123 Cong.Rec. 10,383 (daily ed. April 5, 1977) (statement of Rep. Dingell). The Senate Report states:

> Particularly important is that legislation dealing with this subject recognize the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities in response to changing market conditions and consumer preferences.

*Senate Report*, at 877. The PMPA provisions concerning termination and nonrenewal are central to the counterpoise between fairness to franchisees and flexibility for franchisors that Congress established. As Darling tacitly admits in saying that § 42–133*l* (e) is more protective than PMPA provisions, the Connecticut Act conflicts with that balance. Consequently, we conclude that Darling's arguments to avoid preemption of Connecticut law must fail.

In short, we hold that § 42–133*l* (e)(4) of the Connecticut Act is preempted because it conflicts with § 2802(b)(2)(A) and § 2806(a) of the PMPA. Moreover, because the Connecticut Act is not "the same as" the PMPA, it frustrates the uniform and flexible scheme Congress envisioned.

## II  *Application of the PMPA*

We turn next to the question of whether the 24 hours of operation provision is "reasonable and of material significance" to the relationship between Darling and Mobil under § 2802(b)(2)(A). In applying this provision, the district court held that "[r]easonableness is a subjective standard, in this instance evaluated principally from the perspective of the franchisor." This finding accepted Mobil's assertion that its marketing strategy and recent general business practice includes requiring franchisers to remain open all day, every day. Because it found the 24 hour provision imposed in good faith and in the normal course of business, the district court concluded that the term was "reasonable" and that Mobil's termination therefore was justified under § 2802(b)(2)(A).

In order to resolve this issue, the termination provisions of the Act must be examined. Termination of a franchise is prohibited, except upon specifically enumerated grounds—and, though not at issue here, upon compliance with certain notice requirements—set forth in § 2802(b)(2). Under § 2802(b)(2) a franchisor may terminate when: (1) the franchisee fails to comply with a franchise provision that is "both reasonable and of material significance to the franchise relationship;" § 2802(b)(2)(A); (2) the franchisee does not "exert good faith efforts to carry out provisions of the franchise," § 2802(b)(2)(B); (3) an event occurs that is relevant to the franchise relationship and that makes termination "reasonable," § 2802(b)(2)(C); (4) the franchisor and franchisee mutually agree in writing to terminate, § 2802(b)(2)(D); or (5) the franchisor makes a determination "in good faith and in the normal course of business to withdraw" from the geographic marketing region, § 2802(b)(2)(E). Each of these five grounds also applies to failures to renew a franchise agreement upon its expiration.

In addition, § 2802(b)(3) sets forth additional grounds for non-renewal. The franchisor may refuse to renew when: (1) the franchisor and franchisee fail to agree on

terms for a new agreement, provided the failure to agree is in good faith, in the normal course of a franchisor's business, and is not the result of a franchisor's insistence on changes for the purpose of preventing renewal, § 2802(b)(3)(A); (2) the franchisor receives "numerous bona fide customer complaints" about the franchisee's operation and the franchisee is both apprised of the complaints and given an opportunity to cure, § 2802(b)(3)(B); (3) the franchisee fails to operate clean and safe premises, provided again that there is an opportunity to cure, § 2802(b)(3)(C); or (4) the franchisor determines "in good faith and in the normal course of business" to convert, alter or sell the service station premises or finds it "uneconomical" to continue the franchise relationship. § 2802(b)(3)(D)(i).

These provisions define the rights and duties of parties to the franchise relationship. The task of applying these provisions and developing the legal standards remains essentially with the courts. The Senate Report noted that "the legislation leaves to the courts the task of resorting to traditional principles of equity to maximize attainment of the competing statutory objectives." *See Senate Report* at 896. That courts must give effect to Congress' purposes, an axiom of statutory construction, *see Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 607–08, 99 S.Ct. 1905, 1910–11, 60 L.Ed.2d 508 (1979), is predictably approached by each party in contrasting ways.

Mobil argues that the district court's interpretation of § 2802(b)(2)(A) was correct and is supported by the purposes and language of the PMPA itself and case law. *See, e.g., Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1222–23 (7th Cir.1982). Clearly the district court's decision to analyze the termination "principally from the perspective of the franchisor" works to Mobil's benefit. In Mobil's view, the term "reasonable" means a provision that is grounded in common sense and experience and is not unconscionable. *See also id.* at 1223. The reasonableness standard, Mobil urges, looks to the beliefs and expectations of the franchisor at the time the provision was pro-

posed, not when termination occurred. Moreover, any franchise provision proposed by the franchisor in good faith and in the normal course of business is of "material significance" to the relationship. Mobil argues that "good faith" means subjective good faith and that "in the normal course of business" requires only that the franchisor show that the provision resulted from an ordinary business judgment. This subjective standard, Mobil concludes, would effectuate Congress' purpose of providing franchisors with the flexibility necessary to compete in the marketplace.

Darling asserts, to the contrary, that the Act requires an objective test under § 2802(b)(2)(A); that is, a court must examine all of the facts relating to the provision allegedly providing a ground for termination and determine whether it is reasonable from the perspective of a disinterested observer. Such review would include evaluation of the impact that compliance with the franchise provision has had on the franchisee. Darling insists that adopting this standard would give effect to the Act's basic and overriding purpose of remedying past franchisor abuse in the petroleum marketing industry.

■ We think an objective standard must govern termination of franchise agreements under the Act. To begin with, the statutory language plainly indicates that terminations under § 2802(b)(2)(A), and non-renewals under § 2802(b)(3)(A)(i), invoke different standards of judicial review. *See Slatky v. Amoco Oil Co.*, 830 F.2d 476, 481 (3rd Cir.1987) (*en banc*); *Munno v. Amoco Oil Co.*, 488 F.Supp. 1114, 1118–19 (D.Conn.1980). For example, § 2802(b)(3)(A) permits non-renewal only if proposed changes to the agreement—not acceptable to the franchisee—are "made by the franchisor in good faith and in the normal course of business." Section 2802(b)(2)(A), by contrast, permits termination if the franchisee fails to comply with provisions that are "reasonable and of material significance."

Prior to the PMPA's enactment, the draft provision that became § 2802(b)(3)(A)

would have permitted nonrenewals when "the franchisor and franchisee fail to agree to reasonable changes or additions to the provisions of the franchise . . . ." H.R. 130, 95th Cong., 1st Sess. (1977) *reprinted in* Petroleum Marketing Practices: Hearings Before the Subcomm. on Energy and Power of the House Committee of Interstate and Foreign Commerce on H.R. 130, 95th Cong., 1st Sess. 11–12 (1977). Congress rejected the former reasonableness test and inserted the current "good faith and normal course of business" language in its place. The legislative history demonstrates that the good faith and normal course of business tests were intended to be subjective.

> One test is whether the determination was made "in good faith". This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decision making process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, *yet avoid judicial scrutiny of the business judgment itself.* Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale or distribution of motor fuel, is a wise business decision.

*Senate Report,* at 896 (emphasis added).

Second, and most significantly, Congress made no corresponding change in the language of § 2802(b)(2)(A). Instead, it created two broad categories for terminations and non-renewals: legitimate business decisions by the franchisor, and misconduct or non-performance by the franchisee. *See Slatky,* 830 F.2d at 476 (Congress has "distinguished between the decisions involving general business matters and decisions turning on a right created by the PMPA").

In cases where the franchisor's decision turns on its business judgment or market-ing strategy, Congress has instructed courts to avoid scrutinizing that decision. *See, e.g.,* § 2802(b)(2)(E) (termination or non-renewal permitted upon franchisor's decision to withdraw from the market area if made in good faith and in the ordinary course of business); § 2802(b)(3)(A)(i) (non-renewal based on failure of parties to agree to proposed changes must be in good faith and the normal course of business); § 2802(b)(3)(D) (franchisor's determination that renewal is uneconomical or that non-renewal is due to franchisor's plan to sell, alter or convert premises must be in good faith and in the normal course of business). This standard fully accords franchisors the flexibility Congress envisioned.

The other category of cases is where termination or non-renewal results from a franchisee's alleged misconduct or failure to perform. In this latter type of termination the PMPA creates rights separate and apart from the franchise agreement, which the courts must evaluate in order to determine whether the decision to terminate was reasonable. *See Clinkscales v. Chevron U.S.A., Inc.,* 831 F.2d 1565, 1573 (11th Cir.1987) (courts should carefully scrutinize for reasonableness a termination based on an "event" not enumerated in § 2802(c)); *Slatky,* 830 F.2d at 481; *Sun Refining & Mktg. Co. v. Rago,* 741 F.2d 670, 673 (3rd Cir.1984) (courts must scrutinize the reasonableness of terminations even when an "event" enumerated in § 2802(c) has occurred).

This distinction between rights created by the PMPA and the franchisor's business decisions has been recognized by other courts. In *Slatky,* a petroleum distributor decided not to renew a franchise agreement because the franchise had allegedly become "uneconomical." *See* § 2802(b)(3)(D)(i)(IV). The distributor gave proper notice and proceeded, pursuant to the requirements of the PMPA, to offer to sell the station to the franchisee. The distributor made "a bona fide offer to sell," § 2802(b)(3)(D)(iii)(I), based on its subjective good faith assessment of the station's value. The Third Circuit held that the determination not to renew is a decision made in the normal course of business, subject to the subjec-

tive standard of "good faith." *Slatky*, 830 F.2d at 480–81. The distributor "sets a bona fide price only because the statute requires it to do so." *Id.* at 481. The assessment of the sale price and the offer to the franchisee are part of the PMPA remedial scheme and "a form of compensation to the franchisee for the harm resulting from the distributor's valid business judgment." *Id.* at 481–82. That offer must be objectively reasonable in that it must approach fair market value. *Id.* at 485.

■ Consequently, the basic distinctions created by Congress require that courts refrain from examining the merits of a marketing decision not to renew, but must look carefully at decisions to terminate or not renew based upon a franchisee's misconduct. The former implicates business judgment, the latter concerns whether a right created by an act of Congress has been denied. *Slatky*, 830 F.2d at 481; *see also Clinkscales*, 831 F.2d at 1573; *Sun Refining & Mktg. Co. v. Rago*, 741 F.2d at 673.

Mobil fails to recognize the distinction. Its proposed standard engrafts the deferential business decision rule onto § 2802(b)(2)(A). Congress did not. Mobil cites legislative history to support its position, but that legislative history relates to non-renewal based on marketing decisions. Despite some case law that appears to support Mobil's position, *e.g.*, *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1223 (7th Cir.1982); *Gruber v. Mobil Oil Corp.*, 570 F.Supp. 1088, 1092–93 & n. 6 (E.D.Mich.1983), the case at hand concerns a termination under a PMPA section intended to curtail the previously unfettered discretion of franchisors.[1] We are unwilling to strike out on a path different from that so plainly marked by the language, history and purposes of the Act.

The objective standard best serves the PMPA's goals. By viewing the termination from the franchisor's perspective, the district court undermined the basic and paramount remedial purposes of the Act. The objective standard better promotes the goal of uniformity as well; a subjective standard would, in contrast, make the law vary with the franchisor's marketing regions—a patchwork of the sort Congress wanted to eradicate. Finally, because the objective standard will be more uniform, it will over time promote a measure of certainty. This benefits both parties. Franchisees' expectations in the continuity of the franchise will not be frustrated. Franchisors will know what the law requires and will plan their marketing decisions accordingly.

## CONCLUSION

■ Based on the foregoing analysis, we hold that the proper standard under § 2802(b)(2)(A) is one of objective reasonableness. The allegedly violated provision must be "reasonable"—meaning objectively reasonable—taking into consideration all the relevant facts and circumstances. That provision must also be "of material significance to the franchise relationship." This forecloses the possibility that franchisors may terminate a franchise based on the violation of a technical requirement; the provision must go to the crux of the parties' relationship. All relevant facts, including those occurring between the commencement of the franchise agreement and its purported termination, must be considered when scrutinizing the grounds for termination. In this case those circumstances include the unprofitability of Darling's operations from 10:00 P.M. to 6:00

1. *See also* H.R.Rep. No. 100–1100, 100th Cong., 2nd Sess. 5 (1988). Representative Dingell, the principal sponsor of the PMPA in 1978, recently proposed certain amendments to the Act, in part because of judicial interpretations that are at odds with the language and purposes of the Act. The House Report notes explicitly that "[i]n some cases, courts have refused to apply an objective standard ... when the plain language of PMPA requires an objective standard (*Gruber v. Mobil Oil*, E.D.Mich.1983; *Darling v. Mobil*

*Oil*, D.Conn.1988)." We recognize that proposals and *post hoc* statements are "not entitled to much weight," *Weinberger v. Rossi*, 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982), and that reliance on such statements is a dubious basis for decision. Still, the statement confirms our conclusions that the PMPA's primary purpose is to protect franchisees and that an objective reasonableness test is appropriate in the context of an attempted termination due to alleged franchisee misconduct.

A.M., his attempts to renegotiate the hours of operation, and his reliance on the Connecticut Act. They also include Mobil's marketing strategy, the good-will, if any, generated by round-the-clock operations, Mobil's enforcement of hours of operation provisions at other franchises, and local and regional industry conditions.

We have no occasion to discuss Darling's claims of arbitrary and discriminatory application of the 24 hour provision, though evidence that Mobil selectively enforced such provisions may be relevant to the inquiry into the objective reasonableness of the purported termination. Prior to discovery in the district court, any decision on this score would be premature. For a thorough consideration of the objective reasonableness of Mobil's termination of Darling's franchise, we must remand the case to the district court.

Finally, Darling argues that a preliminary injunction is warranted. Mobil's agreement not to actually terminate the franchise pending appeal eliminates the need to consider such relief. We assume Mobil's agreement to stay termination will continue until its right to proceed is conclusively determined.

In sum, we hold that the Connecticut Act § 42–133*l* (e)(4) is preempted by PMPA § 2802(b)(2)(A) and § 2806(a), and the reasonableness of the franchisor's attempted termination of the franchise under § 2802(b)(2)(A) must be determined on an objective basis.

Accordingly, we affirm the district court's decision in so far as it determined that the federal law preempted the Connecticut Act. We must, however, reverse the court's decision granting summary judgment in favor of Mobil on its termination claim, and remand the case to the district court for application of the correct standard.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.