**Brad RHODES, Plaintiff,**

**v.**

**AMOCO OIL COMPANY, a Maryland Corporation, Defendant.**

**Civil Action No. 95–1224–MLB.**

United States District Court, D. Kansas.

Jan. 8, 1997.

Gary M. Austerman, Robert D. Wiechman, Jr., Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, for plaintiff.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, William J. Noble, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

BELUT, District Judge.

Before the court are the following:

1. Amoco's motion for summary judgment (Doc. 17);

2. Plaintiff's response (Doc. 23); and

3. Amoco's reply (Doc. 25).

This is an action pursuant to the Petroleum Marketing Practice Act, ("PMPA") 15 U.S.C. § 2801 *et seq.* The essential facts are stipulated (Doc. 16)[1] The principal issue for decision is whether Amoco made a bona fide offer to sell the station leased by plaintiff as required by 15 U.S.C. § 2802(b)(3)(D)(iii)(I)[2].

### Uncontroverted Material Facts

In 1984, plaintiff became an Amoco franchisee. In the spring of 1993, Amoco determined to sell all its station properties in the Wichita area. It hired David Hopkins, an experienced certified independent appraiser. Hopkins made an initial appraisal of plaintiff's station dated July 15, 1993. Hopkins' opinion was that the fair market value of the station was $200,000.

Thereafter, by letter dated May 31, 1994, Amoco advised plaintiff that his station lease would not be renewed and would expire on August 31, 1994. Amoco offered to sell the station to plaintiff for $180,000. Pursuant to plaintiff's counsel's request, Amoco forwarded a copy of Hopkins' appraisal on June 30, 1994.

Plaintiff hired his own appraiser, Roger Turner, likewise an experienced certified independent appraiser. Turner's appraisal, dated August 19, 1994, placed a fair market value on the property as of August 10, 1994, of $115,000.

By letter dated August 15, 1994, plaintiff's counsel sent Amoco a copy of Turner's appraisal. Plaintiff made a counteroffer of $77,000 and requested a deadline extension for an unspecified period "to work out the issues raised by this letter." Amoco granted plaintiff's request and extended plaintiff's lease until September 30, 1994. It also extended its $180,000 offer until September 30, 1994.

On September 20, 1994, Amoco advised plaintiff that his counteroffer was rejected. Amoco also advised plaintiff of "some serious flaws" with Turner's appraisal and that it had reconsidered its original offer to sell for $180,000. Amoco proposed an "alternate transaction structure" totalling $158,000.

By letter dated September 27, 1994, plaintiff advised Amoco of his "steadfast" counteroffer of $77,000. Plaintiff enclosed a letter from Turner justifying his appraisal. By letter dated September 29, 1994, Amoco's counsel again declined plaintiff's $77,000 counteroffer but left open the alternate transaction structure set forth in his September 20, 1994 letter. Counsel also granted plaintiff's counsel's request to extend plaintiff's lease to October 31, 1994. The lease was extended again, at plaintiff's request, until November 30, 1994 and again until January 31, 1995. Amoco's offer to sell likewise remained in effect.

---

1. After the stipulation was filed, plaintiff filed his response which set forth "additional facts" which relate to an appraisal done for plaintiff prior to the stipulation, as well as "declarations" by appraisers dated after the stipulation which purport to attack the validity of Amoco's appraisals. Amoco has objected to the "additional facts" (Doc. 25 at 2–3).

2. *Sandlin v. Texaco Ref. and Mktg., Inc.,* 900 F.2d 1479 (10th Cir.), *cert. denied,* 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990) established two discrete facets which compromise a claim for a violation of the PMPA: (1) whether the franchisor made the substantive decision (here, not to renew plaintiff's lease) in good faith and the normal course of business and (2) whether the franchisor fulfilled its remedial obligation to the franchisee by making a bona fide offer to sell the premises. *Id.* at 1481. Based on its review of the complaint (Doc. 1, ¶¶ 30–35) and the summary judgment submissions, the court is satisfied that plaintiff's claim is limited to facet (2), failure to make a bona fide offer within the time period allowed by the statute.

In January 1995, Amoco's counsel informed plaintiff's counsel that Amoco had requested an updated appraisal. The lawyers agreed to extend Amoco's offer and plaintiff's lease until February 28, 1995.

By letter dated February 24, 1995, Amoco's counsel sent plaintiff's counsel a revised appraisal and a new offer of sale totalling $132,000. The lease and revised offer were extended until March 31, 1995. On March 28, plaintiff counteroffered $90,000. Amoco declined the counteroffer by letter of even date.

On March 30, plaintiff's counsel requested a lease extension until April 30, 1995. Amoco agreed. Plaintiff renewed his $90,000 counteroffer on April 21, 1995. When Amoco declined the counteroffer and any further extensions of the lease, plaintiff filed this case on April 28, 1995. The parties then stipulated that plaintiff could continue to operate the station until the case was concluded.

### *Summary Judgment Standards*

The parties are familiar with summary judgment standards, which will not be detailed.

### *The 90–Day Issue*

■ Plaintiff contends that Amoco failed to make a bona fide offer within the 90–day period specified in 15 U.S.C. § 2802. Plaintiff argues that Amoco's May 1994 offer was not bona fide because Amoco made a new offer in February 1995. No authority is cited in support of this argument.

The court rejects plaintiff's argument. There is no question that Amoco's initial offer was made during the statutory 90–day notice period. 15 U.S.C. § 2804(a)(2) and (c). When plaintiff's counsel made the $77,000 counteroffer on August 15, 1994, he suggested a deadline extension, which Amoco granted. It appears that plaintiff either initiated or agreed to every extension thereafter. While plaintiff and Amoco exchanged positions regarding the validity of their respective appraisals, at no time while plaintiff was requesting and receiving extensions did he inform Amoco that its initial offer was not

bona fide and/or that it had not made a bona fide offer within the statutory period. When plaintiff responded to Amoco's revised offer, plaintiff did not contend that Amoco's original offer was not bona fide, nor did he contend that the revised offer was made outside the statutory 90–day period.

It is a basic rule of law that a statute is to be construed in a manner which will avoid impractical or absurd consequences. *H. Wayne Palmer & Assoc. v. Heldor Indus.,* 839 F.Supp. 770, 779 (D.Kan.1993). Plaintiff's argument, if valid, would mean that if a franchisor and franchisee cannot agree on a selling price within the 90–day period, but instead continue negotiations, then the franchisor's initial offer will be deemed not bona fide as a matter of law. Congress could not have intended such an absurd result especially when, as here, the franchisee continually requested and obtained lease extensions beyond the 90–day period, continued to negotiate and made counteroffers, all without ever suggesting to the franchisor that its original offer was not bona fide.

For similar reasons, the court rejects plaintiff's totally unsupported contention that Amoco's 1995 revision of its 1994 offer constitutes an admission by Amoco that its initial offer was not bona fide. There is nothing in the statute which would suggest such an absurd result.

Accordingly, summary judgment is granted to Amoco on plaintiff's claim that Amoco's initial offer was not bona fide because plaintiff did not accept it during the original 90–day statutory period.

### *The Bona Fides of Amoco's Offer*

The court now turns to the real issue raised by the motion: whether Amoco fulfilled its remedial obligation to plaintiff by making a bona fide offer to sell the premises. Whether the offer was bona fide questions the fairness of the franchisor's treatment of the franchisee measured by an objective standard. *Sandlin v. Texaco,* 900 F.2d at 1481. The only objective standard mentioned in *Sandlin* is fair market value:

No matter how the evidence is viewed, the $216,000 offer remains objectively rea-

sonable as a reflection of fair market value. "That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property." *Slatky*, 830 F.2d at 484. Congress intended no more. "Congress treated the bona fide offer requirement not as a statutory recognition of a business judgment but as a form of compensation to the franchisee for the harm resulting from the distributor's valid business judgment." *Id.* at 481–82.

*Id.* at 1482.

### Amoco's Position

Amoco has the burden to demonstrate that it complied with the statutory requirement to make a bona fide offer. Amoco contends that it is entitled to judgment as a matter of law that its $132,000 offer complied with the statute. Amoco points out that plaintiff has admitted that Amoco's manager believed that its offer was objectively developed, reasonable and was based on the property's fair market value (Doc. 17, ¶¶ 20–22 and Doc. 23 at 1). Amoco strenuously argues that since "real estate appraisers almost always disagree," a difference of appraisal values does not mean that an offer is not bona fide and that if a mere difference in appraisals is deemed sufficient to require a judicial resolution, then neither a franchisor nor a franchisee can be expected to voluntarily reach agreement under the PMPA.

### Plaintiff's Position

Plaintiff's position is that the Tenth Circuit has "wholeheartedly" adopted the Third Circuit's decision in *Slatky v. Amoco Oil Co.*, 830 F.2d 476 (1987). Plaintiff argues by implication that the Tenth Circuit would require this court to use the following "inquiry" spelled out in *Slatky:*

> In *Robertson v. Mobil Oil Corp.*, 778 F.2d 1005, 1008 (3d Cir.1985), we defined "bona fide" in the context of the PMPA provision permitting nonrenewal of a franchise because of "bona fide customer complaints" to mean "sincere and having a reasonable basis in fact." We similarly here are guid-

ed by Congress's decision not actually to use the term "fair market value" but instead the term bona fide, which suggests some degree of deference. That choice indicates, we believe, a recognition that "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir.1975) (quoting other cases). "[T]here is no universally infallible index of fair market value." *Id.* There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

On the other hand, a standard of scrutiny that simply focused on whether the distributor believed its offer to represent fair market value would leave the franchisee open to injury through sloppiness or mere error. Such a focus might also prove difficult to apply, for intentions are always difficult to discern, especially when we deal not with the intentions of individuals but of organizations.

We therefore believe that courts should scrutinize the distributor's offer in a manner similar to that we adopted in *Robertson.* Courts should determine first if the distributor believed its offer price represented fair market value. Even if the distributor did have that sincere belief, however, courts should also determine whether the estimate was objectively reasonable. i.e., whether the offer approached fair market value.

### The Need for Remand

In this case, our disagreement with the district court is narrow. The district court found that Amoco sincerely believed its offer to be at fair market value. Slatky has pointed to considerable evidence that might support a contrary finding, in particular to apparently sloppy appraisal methods and to pressures placed on the appraisal department by the district manager, Lemuel Warfield, that resulted in a

higher price. However, the district court's finding on the sincerity of Amoco's belief is not clearly erroneous.

The district court also found that the "procedures" used by the Amoco employees were reasonable, and upon this finding, it apparently risked its judgment that the offer had a reasonable basis in fact. The mere following of reasonable procedures, however, does not necessarily result in a reasonable estimate. To determine whether the estimate was reasonable, the district court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them.

Slatky presented evidence that the land appraisal was based on out-of-date and inappropriate comparables and that the improvements appraisal did not represent local costs. Slatky also presented the testimony of independent appraisers that disagreed markedly with the evaluations of Amoco. Indeed, Amoco's own appraiser, apparently hired for trial preparation, valued the property $31,000 less than the amount offered by Amoco. The district court should have evaluated these specific challenges. In the face of an apparent congruence of independent appraisals that Amoco's estimate was considerably too high, the court had an obligation to state clearly why it found the Amoco estimate objectively reasonable.

*Id.* at 485–86 (footnotes omitted).

### Discussion

The starting point, obviously, is *Sandlin*. It is noteworthy that *Sandlin* came to the Circuit after a jury trial where the "evidence probative of statutory good faith was intermingled with evidence whether the offer of sale was bona fide and the contract was performed in good faith.... Care must be taken not to use the evidence relevant to one test as evidence applicable to the other." *Id.* at 1480, 1482. The court found that there was no evidence from which the jury could conclude that an offer to sell for $216,000 was not bona fide. The court noted appraisals ranging from $200,000 to $233,535, along with an offer for $260,000 from a third party. It is not clear who made the appraisals, why

they differed or what the parties' positions were with respect to the validity of the appraisals.

This case presents cleaner facts. There is no claim of a bad faith decision not to renew. The appraisals range from Amoco's (Hopkins') July 1993 appraisal of $200,000 (revised in February 1995 to $132,000) to plaintiff's (Turner's) August 1994 appraisal of $115,000. Amoco's initial offer after the first appraisal was $180,000. It was dropped after the revised appraisal to $132,000. Plaintiff's counteroffers were $77,000 after Turner's appraisal, later raised to $90,000. There is nothing from these numbers, standing alone, which suggests that Amoco's offer and revised offer were not bona fide. The fact that Amoco secured a revised appraisal almost two years after the initial appraisal is not evidence that the initial offer was not bona fide. The initial and revised offers were based on appraisals of fair market value done by a qualified independent appraiser. Plaintiff has admitted that Amoco believed the offers were based on fair market value. Under *Sandlin*, the objective measurement of the bona fides of a franchisor's offer is fair market value. Amoco's offers, therefore, would appear to meet *Sandlin's* definition of bona fide offers.

What about *Sandlin's* reference to *Slatky?* The court is not persuaded that *Sandlin's* two references to *Slatky* somehow signal "wholehearted" adoption of the entire decision. If that had been the Circuit's intent, surely it would have said so. Nevertheless, the court finds that *Slatky* does not assist plaintiff.

*Slatky* required two things from the district court: first, a determination whether the franchisor believed its offer represented fair market value. Here, plaintiff has admitted this requirement. Second, even if the franchisor had such a belief, the district court had to determine whether the "estimate was objectively reasonable, i.e., whether the offer approached fair market value." The court is not sure what the Third Circuit meant by using the word "estimate" but the words "whether the offer approached fair market value" are clear. This is the *Sandlin* test. In this case, all of Amoco's offers were below

or at fair market value as determined by Amoco's independent appraiser.

This leaves the Third Circuit's instruction on remand regarding the "procedures" followed by Amoco's employees. In *Slatky,* no independent appraiser was used by Amoco. All of the "appraisals" were made by Amoco employees, who did not apply formal appraisal techniques. Slatky presented evidence from independent appraisers that disagreed with Amoco's employees' appraisals, as well as evidence of an appraiser hired by Amoco for trial which valued the property less than Amoco's offer. The Third Circuit could not determine how the district court determined that the Amoco employees' procedures were reasonable and remanded with directions to "focus on the specific facts used by the appraisers in their evaluation and the inferences made for them."

The facts of this case are very different. Amoco's offers were based on independent appraisals. The "procedures" used by Amoco's personnel to formulate the offers are not at issue. Even if plaintiff's post-stipulation "declarations" are taken into consideration (Doc. 32, Exs. 1–3), they attack the validity of the appraisals, not Amoco's procedures in determining its offers. The opinions set forth in the "declarations," made several months after Amoco's final offer was rejected and after suit was filed, were never communicated to Amoco before its final offer was made. As such, they have little, if any, probative value, on the bona fides of Amoco's offers.

■ Finally, this court does not read *Slatky* to say that a trial on the bona fides of an offer or offers is mandated every time independent appraisers disagree. *Slatky's* facts are unique and different from those in this case. The test, stated in both *Slatky* and *Sandlin,* is whether the offer is objectively reasonable as a reflection of fair market value. Amoco's offers in this case pass the test.

Accordingly, the court finds as a matter of law that Amoco fulfilled its remedial obligation to plaintiff by making a bona fide offer to sell the property. Amoco is thus granted summary judgment on plaintiff's claim that Amoco violated the PMPA.

*Orders*

Amoco's motion for summary judgment (Doc. 17) is sustained. All relief requested by plaintiff is denied. Amoco shall have judgment against plaintiff for its statutory costs. Amoco's prayer for attorney's fees is denied because the court finds that plaintiff's action was not frivolous. 15 U.S.C. § 2805(d)(3). A motion for reconsideration of this order, if any, shall comply with this court's rule 7.3, as well as *Comeau v. Rupp,* 810 F.Supp. 1172, 1175 (D.Kan.1992). The motion and any response shall be limited to 5 pages. No reply shall be filed.

IT IS SO ORDERED.