# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

BRAD RHODES,

      Plaintiff-Appellant,

v.

AMOCO OIL COMPANY,

      Defendant-Appellee.

No. 97-3066

## ORDER
Filed June 5, 1998

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

Appellee's petition for rehearing is **denied**. The court hereby directs the Clerk to make the following change to the opinion filed herein on May 13, 1998: On page 12, the sixteenth line of text begins a new paragraph; in the first sentence of that paragraph, which begins on line 16 and ends on line 17, the words "also a certified appraiser" are to be deleted. The following words are to be added in place of the deleted words: "who is president of a real estate services company."

Entered for the Court

Patrick Fisher
Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 13 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRAD RHODES,

      Plaintiff-Appellant,

v.

AMOCO OIL COMPANY,

      Defendant-Appellee.

No. 97-3066

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 95-1224-MLB)**
**(955 F. Supp. 1288)**

---

Christopher A. McElgunn (Gary M. Austerman and Robert D. Wiechman, with him on the brief), of Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, Kansas, for Plaintiff-Appellant.

William J. Noble, Amoco Corporation (Joseph W. Kennedy of Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kansas, with him on the brief), Chicago, Illinois, for Defendant-Appellee.

---

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

Plaintiff-appellant Brad Rhodes (Rhodes or plaintiff) brings this appeal from the district court's final order granting summary judgment to defendant Amoco Oil Company (Amoco or defendant). Rhodes v. Amoco Oil Co., 955 F. Supp. 1288 (D. Kan. 1997). Jurisdiction in the district court was asserted under the Petroleum Marketing Practices Act (the PMPA), 15 U.S.C. §§ 2801-2841. Our jurisdiction arises under 28 U.S.C. § 1291.

**I**

The facts are set out in the district court's opinion. A brief overview will suffice to provide the background for our discussion of the issues raised on appeal. Rhodes operated a service station in Derby, Kansas, just outside Wichita, as lessee and franchisee of Amoco. In 1993, Amoco decided to sell all of its retail stations in the Wichita area. Amoco retained a certified appraiser, David Hopkins, to appraise all of its properties in the Wichita area, including that leased by plaintiff. Hopkins initially appraised the property leased by Rhodes at $180,477. Based on that appraisal, Amoco offered to sell the property to plaintiff for $180,000.

Plaintiff declined that offer and hired his own appraiser, Roger Turner, who like Hopkins was independent, experienced, and a certified appraiser. Turner appraised the property at $77,500.[1] Plaintiff then made a counteroffer of $77,000 to purchase the station.

---

[1] In his detailed opinion, the district judge stated that Turner's appraisal placed a fair market value of $115,000 on the property. 955 F. Supp. at 1289. As Rhodes pointed out in a motion for reconsideration, this statement was understandable but significantly flawed. Turner's appraisal did in fact state that amount. But the parties have agreed at all times that

2

Thereafter, the parties continued to negotiate, with Amoco several times extending Rhodes's lease so that the negotiations could continue. These dealings are described in the district court's opinion, 955 F. Supp. at 1289-90, and need not concern us now. For our purposes, we should focus only on Amoco's final offer. Amoco eventually asked Hopkins to update his appraisal of the property, and Hopkins' second appraisal concluded that the fair market value of the property was $132,000. Amoco then offered the property to Rhodes at that price on February 24, 1995. Rhodes made a final counteroffer of $90,000, which Amoco rejected.

Rhodes then commenced this action on April 28, 1995. His complaint alleges that the action arises under the PMPA, 15 U.S.C. §§ 2801-2806, and that there was a violation of the act due to lack of compliance with the requirements of 15 U.S.C. § 2802(b) as to proper notification of grounds for nonrenewal; that Amoco had not made, during the required 90-day period after notification of nonrenewal, a bona fide offer to sell, transfer or assign to plaintiff Amoco's interest in the Leased Marketing Premises; that Amoco's revised offer to sell for $132,000 in its February 24, 1995, offer to Mr. Rhodes was an admission, like earlier admissions, that the earlier offers were not bona fide offers and that Amoco's admissions establish that Amoco violated the PMPA by failing to make a bona fide offer within the 90-day period after giving notice of nonrenewal. App. 7-9. Plaintiff prayed, inter alia, for

both Turner's and Hopkins' appraisals must be adjusted to exclude the value of car wash equipment owned by Rhodes. In this opinion we will refer in all instances to the value of any appraisal as adjusted to reflect only the value of Amoco's property. In an unpublished order denying plaintiff's motion for reconsideration, the district judge stated that his conclusions were unaffected by this correction to his findings.

preliminary and permanent injunctive relief, declaratory relief, and damages under the PMPA provisions. Id. at 10-11.

Holding that Amoco's February 1995 offer of $132,000 satisfied Amoco's statutory duty to make a "bona fide" offer to sell the property to its franchisee, Rhodes, the district court granted a motion by Amoco for summary judgment. On review of summary judgments, we "examine the record to determine if any genuine issue of material fact was in dispute" and if not, whether the substantive law was correctly applied; and when applying this standard of review, "we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics v. First Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990). Under this standard, we conclude that on this record the summary judgment must be reversed.

## II

Congress has seen fit to regulate the relationships between franchisors such as Amoco and their franchisees through the PMPA. The PMPA affords protection to franchisees because "Congress found that [franchisors] had been using their power over franchisees to further their own self-interest." Slatky v. Amoco Oil Co., 830 F.2d 476, 482 (3d Cir. 1987) (en banc). In remedying the disparity in bargaining power of the parties, "Congress protected the franchisee's interests by curbing those of the [franchisor]. Senate Report at 18, U.S. Code Cong. Ad. News 1978, at 876." Id.

The statute creates two basic mechanisms to protect the franchisees. First, the statute

4

proscribes termination or nonrenewal of franchises except on specified grounds. 15 U.S.C. § 2802(b)(3); see generally Slatky, 830 F.2d at 478-79. This limitation generally prohibits "the arbitrary and discriminatory termination or nonrenewal of a franchise." Sandlin v. Texaco Refining and Marketing, Inc., 900 F.2d 1479, 1480 (10th Cir. 1990). This first facet of the PMPA's protection of the franchisee concerns whether the franchisor made the "substantive decision [for termination or nonrenewal] in good faith and the normal course of business . . . ." Sandlin, 900 F.2d at 1481. This first inquiry "tests the honest commercial judgment of the franchisor," id., and here courts look to the franchisor's intent by a good faith test, "a subjective test," id. at 1481 (quoting Svela v. Union Oil Co. of California, 807 F.2d 1494, 1501 (9th Cir. 1987) (emphasis added)). This part of the PMPA does not concern us here; Rhodes has never contended that the initial decision not to renew his franchise agreement was made in bad faith or for other than permissible reasons.

We are concerned on this appeal only with the second protective mechanism afforded by the PMPA -- that the franchisor make "a bona fide offer to sell, transfer or assign" its interest in the premises to the franchisee. 15 U.S.C. § 2802(b)(3)(D)(iii)(I).[2] In connection with this second protective mechanism requiring a bona fide offer, this court has pointed out that

[t]he bona fide offer provision therefore serves as a second, and distinct, layer

_____

[2]This bona fide offer requirement applies where an oil company terminates or fails to renew a franchise for a permissible business purpose unrelated to the franchisee's misconduct. Slatky, 830 F.2d at 478.

5

of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.

Sandlin, 900 F.2d at 1481 (quoting Slatky, 830 F.2d at 484.

As we held in Sandlin, "we use an objective test to decide whether an offer is bona fide." Sandlin, 900 F.2d at 1481 (emphasis added). It is important to keep in mind that this appeal does not concern a subjective question of good faith concerning the commercial decision on termination or nonrenewal. In fact, "[e]vidence of the first [the subjective nonrenewal decision] is not evidence of the second [the objective bona fide offer] . . . ." Id. (emphasis added).

Furthermore, we are concerned only with Amoco's final February 1995 offer to sell the property to Rhodes for $132,000. In the district court, Rhodes took the position that Amoco's initial offer was not bona fide, apparently because Amoco later made a lower offer, and that its final offer was outside the 90-day time period established by the PMPA. Rhodes, 955 F. Supp. at 1290. The district court rejected that argument, and on this appeal Rhodes does not question that holding. Thus, we focus only on whether Amoco's final $132,000 offer was bona fide as that term has been construed under the PMPA.

In considering Congress' intent in using the term "bona fide" in this context, we find helpful guidance in Slatky, an opinion which was found instructive by our earlier panel in Sandlin. In particular, we take heed of the Third Circuit's insight that the use of this term, rather than a mandate that the franchisor offer the property to the franchisee *at* fair market

6

value, reflects a legislative judgment that the latter standard would be overly strict. In Slatky, the court said:

> We . . . are guided by Congress's decision not actually to use the term 'fair market value' but instead the term bona fide, which suggests some degree of deference. That choice indicates, we believe, a recognition that "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." Amerada Hess Corp. v. Commissioner, 517 F.2d 75, 83 (3d Cir. 1975) (quoting other cases). "[T]here is no universally infallible index of fair market value." Id. There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

Slatky, 830 F.2d at 485. The Slatky court went on to hold that district courts should determine whether the franchisor's offer "approached fair market value." Id.

We agree with this reasoning. Thus, we do not fault the district court here for not trying to quantify precisely the fair market value of the subject property. There are countervailing considerations as well, however, and we also find helpful this insight from Slatky: "On the other hand, a standard of scrutiny that simply focused on whether the distributor believed its offer to represent fair market value would leave the franchisee open to injury through sloppiness or mere error." Id. (emphasis added). Thus, we hold that the franchisor is not automatically entitled to immunity from having its offer scrutinized and from that offer's bona fides being tested against other evidence as to what "approached the fair market value." Hence the franchisor may not avoid the raising of a genuine issue of fact concerning his offer, and may not obtain a summary judgment merely because he has based

7

the offer in question on the results of an independent appraisal. That approach would not protect the franchisee in a case, which we would hope would be the unusual one, in which the appraisal is flawed "through sloppiness or mere error."

We wish to emphasize, however, that we do *not* hold that summary judgment for the franchisor can never be proper, and that jury trial must always be had, whenever the parties each produce an appraisal and the appraisals do not arrive at identical conclusions on value. Indeed, Sandlin provides a clear example of a case in which judgment was proper for the franchisor in spite of a difference between the parties' appraisals, because the difference between the two was relatively small and the franchisor's offer was between the two.[3] Hence it was decided, on the record facts in Sandlin, to hold as a matter of law that the offer was bona fide.

In sum, in reviewing the summary judgment granted to Amoco here, we must determine if there is a genuine issue of material fact whether Amoco's February 1995 offer at $132,000 was bona fide, considering the circumstances objectively. Thus considering this record, we are convinced that the evidence and reasonable inferences therefrom do reveal such a factual issue concerning that offer.

In the first place, the magnitude of the difference between the Hopkins appraisal, on

_____

[3]In Sandlin, we reversed a judgment for the franchisee after a jury trial, holding that there was no evidence from which the jury could have found that the franchisor's offer was not bona fide, and remanded with instructions to enter judgment for the franchisor. 900 F.2d at 1482-83.

8

which the $132,000 offer was based, and the Turner appraisal cannot be ignored in reviewing this summary judgment. Mr. Turner's appraisal, prepared at the request of plaintiff Rhodes, was for $77,500. The lowest appraisal obtained by Amoco from Mr. Hopkins was $132,000. Amoco's lowest appraised value is thus some 70% higher than the Turner appraisal obtained by plaintiff.[4]

---

[4]The dissent, p. 8, observes that "the PMPA speaks in terms of offers, not appraisals" and concludes that we should examine not the difference between the estimates of fair market value provided by the two appraisers, but the difference between the parties' offers. The PMPA has nothing to say about offers made by a franchisee. We are examining only the offer of Amoco to determine if it is objectively bona fide. The dissent agrees that the criterion is whether the offer approaches fair market value. On this record the parties' appraisals provide substantial evidence on that question. In pursuing that inquiry on this record, however, it is unsound to take Rhodes' offer of $90,000 as binding on him as a measure of fair market value.

Fair market value is generally defined as the price at which a sale would take place "between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Brownstein v. Arco Petroleum Products Co., 604 F. Supp. 312, 315 n.3 (E.D. Pa. 1985) (emphasis added) (quoting Black's Law Dictionary 537 (5th ed. 1979)). The dissent implicitly assumes that the buyer here was under no compulsion to buy. It is surely wrong to make that assumption on summary judgment. The record indicates that Rhodes had operated the station at this location since 1984. Rhodes, 955 F. Supp. at 1289. If we were to draw any inference from this fact, mindful of our duty to make reasonable inferences in favor of the nonmovant on summary judgment, we would infer that Rhodes had acquired goodwill in his business and that the goodwill was tied, at least in part, to operation of the business at its existing location. The familiar definition of fair market value assumes a hypothetical buyer who is willing to buy, but not a buyer who already has a vested interest to protect and is under pressure from the franchisor's nonrenewal. No doubt that is why another circuit has observed that under the PMPA a bona fide offer "would not include the value of the franchisee's own goodwill or [the franchisor's] franchise value of the station." Ellis v. Mobil Oil, 969 F.2d 784, 788 (9th Cir. 1992). Further, Congress recognized that nonrenewal of a franchise can have a "punitive" character because "[t]he reasonable expectations of the franchisee . . . are destroyed." S. Rep. No. 95-731 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 876. Hence the franchisee's offer cannot be presumed to be unaffected by coercion, particularly on

Viewing this "factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment," Applied Genetics, 912 F.2d at 1241, the appraisal of Rhodes' expert, Turner, must be considered as evidence showing an accurate estimate of fair market value. It is important to note that Amoco offered no criticism of the Turner appraisal in its motion for summary judgment and supporting papers. Instead, Amoco emphasized the process by which it made various earlier offers to Rhodes, suggesting that they prove the bona fides of its offer at issue. That evidence about earlier offers is not persuasive. Under the objective standard enunciated in Sandlin, the only issue here is whether a genuine issue of material fact was raised concerning whether Amoco's final $132,000 offer was bona fide.

While "there may be a range of prices with reasonable claims to being fair market value," Slatky, 830 F.2d at 485, the evidence here clearly raises factual issues on the bona fide offer question. Amoco has provided nothing other than the Hopkins appraisal which would cast doubt on the analysis and conclusion reached by Turner. Amoco has provided no evidence as to the degree of discrepancy between the two appraisals in question which could be considered "normal" or reasonable.

The discrepancy here between Hopkins' $132,000 appraisal and Amoco's offer based on it, and the Turner appraisal of $77,500, is in stark contrast to the facts in Sandlin. The highest estimate there was $233,535, and the lowest was $200,000, a difference of about

summary judgment.

10

17%.  The appraisals in <u>Sandlin</u> must actually be viewed as having less variation than that, however, because the lowest excluded tanks and equipment, while the highest included them. 900 F.2d at 1482 n.2.  While we did not indicate what the permissible differential was in <u>Sandlin,</u> it was nowhere close to the 70% variation we are faced with in the instant case.[5] And the $216,000 offer in question in <u>Sandlin</u> fell well between the two estimates there.

Moreover, there is no response addressing plaintiff's other evidence.  These specific points were developed by Mr. Turner in his affidavit, offered by Rhodes, each of which identifies asserted deficiencies in the 1995 Hopkins appraisal submitted by Amoco:

1.  Although the primary structure of the service station was erected in 1953 and the car wash bay was added in 1975, Mr. Hopkins concluded, without explanation or documentation, that the "effective age" of the property was 15 to 18 years.

2.  Hopkins did not account for the trend of declining sales at plaintiff's location over recent years, nor did he take into account the declining profit margins of retail service stations generally.

3.  Hopkins did not consider the impact of two new, major competitors in the immediate vicinity of the subject property and their influence on traffic patterns.

---

[5]On remand the district court in <u>Slatky</u> received evidence to the effect that appraisers attempt to get within 5% of the anticipated actual selling price; that selling prices can vary from 25% over to 25% under offering price; that properties are often sold at 15% to 20% over the appraised price; that two appraisers attempting to estimate fair market value should reach results within 10% to 15% of each other; and that the expected variation between appraisals could be greater when using the replacement cost approach.  <u>Slatky v. Amoco Oil Co.,</u> No. 85-1122 (M.D. Pa. May 10, 1989) (order denying motion for reconsideration of order granting injunctive relief).  (This order was placed in the district court record in an appendix submitted with defendant's memorandum in support of its motion for summary judgment, and it also is included in our record on appeal.  App. at 246-47.)

11

4. In evaluating sales of comparable properties, Hopkins made adjustments to the sales prices on three properties without proper explanation or documentation.

5. In applying the cost approach, Hopkins used a replacement cost of $80 per square foot, while Turner recommended, based on his information and experience, a figure of about $58 per square foot.

6. Depreciation estimates given by Hopkins were mere opinion without supporting data.

7. Hopkins' cost approach reflects a lack of understanding of the changing business climate.

8. In using the sales comparison approach, Hopkins used the other sales in the area by Amoco, without adjustment for the fact that all of the buyers were "under duress" because of their relationships with Amoco; none of these sales should have been considered normal, arms' length transactions.

App. at 282-85.

Plaintiff Rhodes also submitted an affidavit from Mr. Steve Martens, who is president of a real estate services company. A checklist was attached and incorporated in Martens' affidavit, which also identified a number of alleged deficiencies in the Hopkins appraisal. Among other things, Mr. Martens questioned why Mr. Hopkins had relied only upon the cost approach of estimating the market value. The standard procedure, he explains, is to prepare estimates using the cost approach, the income approach, and the comparable sales approach, before selecting the estimate which best represents fair market value. Mr. Martens concluded that the Hopkins appraisal was not acceptable. App. at 286-87, 293-94.[6]

---

[6]After having noted <u>Sandlin</u> and the objective nature of the scrutiny of the franchisor's offer, the district judge proceeded to hold that plaintiff's evidence, which we have just

12

In sum, considering the record evidence before us in the light favorable to Rhodes, as we must in reviewing this summary judgment, we hold that there is a genuine issue of material fact whether Amoco's $132,000 offer in question was bona fide under the PMPA requirement. Accordingly, we reverse the summary disposition of that controlling factual issue without trial.

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

_____

summarized, had "little, if any, probative value, on the bona fides of Amoco's offers" because the evidence was not communicated to Amoco until after suit had been filed. 955 F. Supp. at 1293. Thus, the district judge apparently disregarded plaintiff's evidence submitted in opposition to the motion for summary judgment because the judge somehow felt that the evidence should have been disclosed to the defendant during the pre-litigation negotiations. We find no support for such a requirement in the principles of Sandlin. In spite of his acknowledgment of <u>Sandlin</u>, the judge seems to have analyzed the issue in terms of Amoco's subjective good faith. As we have noted, the proper test is an <u>objective</u> analysis whether the final offer of Amoco was bona fide. In this analysis , whether the plaintiff's evidence was communicated to Amoco before commencement of the lawsuit could have no bearing.

13

97-3066, <u>Rhodes v. Amoco Oil Co</u>.

BALDOCK, Circuit Judge, dissenting.

In enacting the Petroleum Marketing Practices Act, Pub. L. No. 95-297, 92 Stat. 322 (1978) (codified as amended at 15 U.S.C. §§ 2801-2841) (hereinafter PMPA), "Congress did not intend to intrude courts into the marketplace." <u>Sandlin v. Texaco Refining and Marketing, Inc.</u>, 900 F.2d 1479, 1481 (10th Cir. 1990). Rather, Congress enacted the PMPA "to equalize the . . . disparity in bargaining power" between gasoline station franchisors and franchisees. <u>Doebereiner v. Sohio Oil Co.</u>, 880 F.2d 329, 331 (11th Cir. 1989) (citing S. Rep. No. 95-731 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 873), <u>amended on rehearing</u>, 893 F.2d 1275 (11th Cir. 1990). Regrettably, this court's opinion thwarts the intent of Congress by effectively tipping the bargaining scales in favor of the franchisee, and thrusting courts (at least in this circuit) into the franchise relationship.

To be sure, the question of whether a franchisor's offer to sell is "bona fide" as required by the PMPA, <u>see</u> 15 U.S.C. § 2802(b)(3)(D), addresses the fairness of the franchisor's treatment of the franchisee under an objective standard. <u>See</u> <u>Sandlin</u>, 900 F.2d at 1481. By requiring a "bona fide offer to sell," Congress undoubtedly intended to protect the franchisee from an <u>unreasonably high offer price</u> which would preclude the franchisee's purchase of the business and frustrate the franchisee's expectation of continuing the franchise relationship. <u>See</u> <u>id</u>. at 1482 (defining fair market value as "the <u>highest</u> price a willing buyer would pay") (emphasis added). Yet there can be little doubt that Congress' did not use the term "bona fide," with its notions of subjective good faith, <u>see</u> <u>Roberts v. Amoco Oil Co.</u>,

740 F.2d 602, 607 (8th Cir. 1984), to place the franchisor at an obvious disadvantage. Rather, Congress' use of the term "bona fide" suggests that courts afford "some degree of deference" to a franchisor's valuation of its property. Slatky v. Amoco Oil Co., 830 F.2d 476, 485 (3d Cir. 1987) (en banc) (emphasis added). Otherwise, the PMPA would afford no protection to the franchisor's legitimate property rights and economic interests. While in this case the court's opinion gives lip service to Amoco's legitimate rights and interests, it effectively ignores them. Surely this was not Congress' intent.

This court's decision turns solely upon the disparity between Amoco's final independent appraisal of $132,000 and Rhodes' independent appraisal of $77,500. Twenty-three years of law practice taught me, however, that independent appraisers will typically appraise the value of property consistent with their clients' wishes, using the method of appraisal which most benefits their clients' interests. This is so because "the word 'value' almost always involves conjecture, a guess, a prediction, a prophecy." Amerada Hess Corp., v. Commissioner, 517 F.2d 75, 83 (3d Cir. 1975) (internal quotations omitted). "[T]here is no universally infallible index of fair market value. All valuation is necessarily an approximation." Id. After today, I can envision few cases in this circuit where a disgruntled franchisee will be unable to generate an appraisal sufficiently disparate from the franchisor's to require a jury trial, despite the ongoing objective good faith efforts of the franchisor to reach an agreement. Thus, a franchisor will "rarely rest comfortably" that its offer to sell is "bona fide." Slatky, 830 F.2d at 485. Because I believe based on the law and facts of this

2

case that the appraisers' difference of opinion alone is insufficient to require a jury determination as to whether Amoco's offer to sell was "bona fide," I would affirm the district court's grant of summary judgment to Amoco. Accordingly, I dissent.

I.

The relevant facts are undisputed and are set forth in detail in the district court's opinion. Rhodes v. Amoco Oil Co., 955 F. Supp. 1288, 1289-90 (D. Kan. 1997). This court, however, chooses to ignore most of those facts, namely all of those facts relating to the parties' negotiations over the course of eleven months, focusing instead "only on Amoco's final offer." Because this court's opinion brushes aside as of no "concern" and "not persuasive," facts which bear directly upon the question of whether Amoco's offer to Rhodes was "bona fide," I shall briefly summarize them here.

Rhodes acknowledges that in the Spring of 1993, Amoco, in compliance with the PMPA, made a good faith decision in the normal course of business to sell all of its service stations in the Wichita metropolitan area. Amoco retained David Hopkins, an experienced certified independent appraiser, to appraise the Wichita area stations. In accordance with the Uniform Standards of Professional Appraisal Practice, Hopkins prepared fair market value appraisals based on the highest and best use for each of Amoco's dealer-operated service stations in the Wichita area. Hopkins initially appraised the subject property at $180,477. Relying upon Hopkins' appraisal, Amoco offered to sell the property to Rhodes in the Spring of 1994 for $180,000.

3

Dissatisfied with Amoco's offer, Rhodes hired his own appraiser, Roger Turner, who, like Hopkins, is an experienced certified independent appraiser. Using the sales comparison approach, Turner appraised the fair market value of Amoco's property at $77,500. Based upon Turner's appraisal, Rhodes made a counteroffer to Amoco in the Summer of 1994 of $77,000. Rhodes also requested that Amoco extend his lease one month pending negotiations. Amoco agreed to extend the lease, but, within the month, rejected Rhodes' counteroffer as based upon a "flawed" appraisal. Amoco, however, lowered its initial offer of $180,000 to $158,000, while also proposing several alternative sale structures. During this same period, Amoco continued to extend the lease to accommodate Rhodes.

In the Fall of 1994, Rhodes wrote Amoco and asserted "several problems" with Hopkins' initial appraisal. In response, Amoco advised Rhodes that it would secure a revised appraisal from Hopkins early the next year. At the same time, Amoco again extended Rhodes' lease. In February 1995, Amoco submitted to Rhodes a revised appraisal and new offer to sell--this time for $132,000. Rhodes rejected Amoco's new offer, and instead offered to purchase the property for $90,000. When Amoco rejected Rhodes' counteroffer and refused to extend the lease beyond April 1995, Rhodes filed suit. Relying on the foregoing facts, the district court held that Amoco's $132,000 offer was "objectively reasonable as a reflection of fair market value," and granted its motion for summary judgment. Rhodes, 955 F. Supp. at 1293.[7]

_____

[7] Under 15 U.S.C. § 2802(b)(3)(D), a franchisor is required to tender a bona fide offer
(continued...)

4

II.

This court correctly observes that an objective standard governs the determination of whether a franchisor's offer to sell is bona fide under the PMPA. See Sandlin, 900 F.2d at 1481. In Sandlin, we set aside a jury verdict in favor of the franchisee in part because the franchisor's offer to sell fell within the range of independent appraisals. We held that there was "no evidence to be found from which the jury could conclude that . . . [the franchisor's] written offer to sell the premises for $216,000 was not bona fide." Id. at 1482. We stated that an offer is objectively reasonable and thus bona fide where it is "a reflection of fair market value." Id. We defined fair market value as "the highest price a willing buyer would pay." Id.

In other words, "the objective reasonableness test does not measure whether the franchisor's offer was actually at fair market value but rather whether the offer approached

_____

[7](...continued) to sell the premises within 90 days after notifying the franchisee of nonrenewal. In the district court, Plaintiff asserted that Defendant's first offer of $180,000 made within the 90-day period was not bona fide. Because of the parties' ongoing negotiations, the court rejected Plaintiff's argument:

> Plaintiff's argument, if valid, would mean that if a franchisor and franchisee cannot agree on a selling price within the 90-day period, but instead continue negotiations, then the franchisor's initial offer will be deemed not bona fide as a matter of law. Congress could not have intended such an absurd result . . . .

Rhodes, 955 F. Supp. at 1290. On appeal, Plaintiff has abandoned his argument that Defendant's initial offer of $180,000 was not bona fide, and now asserts only that Defendant's final offer of $132,000 was not bona fide.

5

fair market value." LCA Corp. v. Shell Oil Co., 916 F.2d 434, 439 (8th Cir. 1990) (emphasis added); accord Ellis v. Mobil Oil, 969 F.2d 784, 787 (9th Cir. 1992) (To be objectively reasonable, franchisor's offer must "approach fair market value."); Slatky, 830 F.2d at 485 (same). In Slatky, the Third Circuit explained:

> There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

Id.[8]

Thus, because Congress in enacting the PMPA sought to balance the competing interests of the franchisor and franchisee, an offer is bona fide under the PMPA if it falls within the "range of prices with reasonable claims to being fair market value." Id. Consistent with congressional intent, this approach is designed to guarantee an offer price to the franchisee based upon the realities of the marketplace and protect the franchisee's expectation of continuing the franchise relationship, while preserving the franchisor's legitimate property rights and economic interests. See S. Rep. No. 95-731, at 18-19 (1978),

---

[8] In Slatky, Amoco's in-house appraisers valued the service station property with improvements at $276,300. Slatky's appraiser, however, valued the same property at $158,200. Amoco offered to sell the property with improvements to Slatky for $306,000. At bench trial, even Amoco's independent appraiser valued the property at $31,000 less than Amoco's offer. "In the face of an apparent congruence of independent appraisers that Amoco's estimate was considerably too high," the appellate court remanded the case so the district court could state precisely why it had found that Amoco's offer was objectively reasonable. 830 F.2d at 486.

reprinted in 1978 U.S.C.C.A.N. 873, 876-77. Moreover, it relieves the fact finder from the exacting task of placing a precise value upon the property--a task which would amount largely to impermissible guesswork.

Unfortunately, this court's opinion does little to further these aims. Admittedly, a difference of opinion between independent appraisers is an important factor which a court must consider in determining whether a particular offer is bona fide under the PMPA. See LCA Corp., 916 F.2d at 439 (whether an offer is bona fide must be decided on a case-by-case basis). The dispute in this case, however, involves little more than a swearing match between independent appraisers over the proper method by which to determine the fair market value of the service station property.

The court's opinion infers that Amoco retained some fly-by-night appraiser whose appraisal is flawed "through sloppiness or mere error." I take issue with that inference. Rhodes stipulated that Amoco's appraiser has appraised more than 3,000 petroleum marketing properties over eighteen years and performed appraisal services for more than 100 different clients including major oil companies, smaller oil companies, and jobbers. As I have explained, an appraisal is necessarily an estimate of the fair market value of property. Like so many legal concepts, experts do not disagree on the definition of fair market value. Problems arise only when those experts attempt to apply that definition to a particular case. Disagreement among appraisers is the norm. See Stephen J. Alfred, Fair Market Value Concept, 14 Case W. Res. L. Rev. 173, 175 (1963).

Even accepting that Rhodes final offer of $90,000 was within the "range of prices with reasonable claims to being fair market value," I find no evidence in the record from which a jury could conclude that Amoco's $132,000 offer was not also within that range. Over the course of eleven months and at least seven lease extensions, Amoco made three offers to sell the property to Rhodes in the respective amounts of $180,000, 158,000, and $132,000. Amoco also apparently proposed alternative sale structures to Rhodes in an attempt to reach an agreement. During that same period, Rhodes made two counteroffers in the amounts of $77,000 and $90,000. Unfortunately, the parties could not reach an agreement.

This court's opinion makes much ado over the 70% difference between Amoco's $132,000 appraisal and Rhodes $77,500 appraisal. The court's analysis is misguided for two reasons. First, the PMPA speaks in terms of offers, not appraisals. Rhodes countered Amoco's final offer of $132,000 with an offer of $90,000, yielding a difference of 46%, not 70%. Second, one need not have a degree in statistics to understand that where the appraised value of property is relatively low, as in this case, a slight difference in appraised value will yield a relatively large percentage difference. Conversely, where the appraised value of property is relatively high, a large difference in appraised value will yield a relatively small percentage difference. Thus, analyzing the problem in terms of the "magnitude of the difference" is misleading. For instance, if one appraiser valued a piece of property at $680,000 and another appraiser valued the same property at $400,000, the percentage

8

difference in the appraisals would still be 70%. Yet, when compared with the difference between $132,000 and $77,500, the difference between $680,000 and $400,000 gives one much more reason to pause.

Despite the implications of the court's opinion, the PMPA does not require that the parties reach agreement, or that the franchisor meet the franchisee's price. Rather, the PMPA requires only that the franchisor make "a bona fide offer to sell" to the franchisee. The parties' appraisers, both using widely accepted techniques for calculating a property's fair market value, reached disparate values. A difference of opinion, however, does not alone create a material issue of fact for trial. Sandlin, 900 F.2d at 1482. The evidence before the district court clearly demonstrated that Amoco's asking price viewed objectively fell within the "range of prices with reasonable claims to being fair market value." Therefore, there is no genuine issue of material fact which prevented the district court from granting Amoco's motion for summary judgment. In this case, Amoco complied with the PMPA. Accordingly, I would affirm the judgment of the district court.